**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, | CR 13-37-M-DWM |
| vs. | **DEFENDANT'S BRIEF IN SUPPORT OF MOTION TO DISMISS THE INDICTMENT AND ALTERNATIVE MOTION TO STRIKE COUNT I OR FOR OTHER APPROPRIATE RELIEF BASED ON PROSECUTORIAL MISCONDUCT** |
| JORDAN LINN GRAHAM, Defendant. | |

ANDREW J. NELSON
Assistant Federal Defender
MICHAEL DONAHOE
Senior Litigator
Federal Defenders of Montana
Missoula Branch Office
125 Bank Street, Suite 710
Missoula, MT 59802
Phone: (406) 721-6749
Fax:   (406) 721-7751
Email: andy_nelson@fd.org

Attorneys for Defendant

November 8, 2013

# TABLE OF CONTENTS

Page No.

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

I.    INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   FACTS RELEVANT TO THIS MOTION. . . . . . . . . . . . . . . . . . . . . . . . . . 2

      (A)    Pertinent Background And Circumstances.. . . . . . . . . . . . . . . . . . . . . 2

      (B)    Jordan Is Summoned To The Kalispell Police
             Department For Investigation.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      (C)    Agent Smiedala Conducts Unrecorded Pre-interview
             With Jordan. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      (D)    Jordan's First Recorded Statement With
             Special Agent Smiedala. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
             1)    Jordan describes having the "wedding blues.". . . . . . . . . . . . 6
             2)    The progression of the argument between the
                   couple during the evening.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
             3)    How Jordan and Cody ended up on the ledge... . . . . . . . . . . . . 8
             4)    How Cody fell from the ledge. . . . . . . . . . . . . . . . . . . . . . . . . . 9
             5)    There was no plan or intention to kill Cody.. . . . . . . . . . . . . 10
             6)    Jordan lied to law enforcement officers multiple
                   times prior to July 16, 2013... . . . . . . . . . . . . . . . . . . . . . . . . 12

      (E)    Agent Smiedala Consults With Others About The
             Need For Further Questioning And About Arresting Jordan . . . . . . 12

      (F)    Jordan's Second Recorded Interview With Agent Smiedala. . . . . . . 13
             1)    Motive.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
             2)    Jordan's Intent.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
             3)    False Statements to Officers.. . . . . . . . . . . . . . . . . . . . . . . . . 17

(G)     The Recorder Is Turned Off And Jordan Is Asked  More
        Questions.  The Decision Is Made To Release Jordan. . . . . . . . . . . 17

(H)     Agent Liss Prepares Complaint Affidavit For
        Second Degree Murder Two Months Later
        (Doc. #1-1; Addendum at 104-108).. . . . . . . . . . . . . . . . . . . . . . . . 18

(I)     Jordan Is Released On Conditions Over The
        Government's Objection And Jordan Is Indicted For
        Both First And Second Degree Murder... . . . . . . . . . . . . . . . . . . . . 20

III.    ARGUMENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

(A)     The government failed to preserve evidence and
        violated defendant's due process rights. . . . . . . . . . . . . . . . . . . . . . 21
        (1)     Apparent antecedent exculpatory
                value (1st *Trombetta* Factor).. . . . . . . . . . . . . . . . . . . . . . . 22
        (2)     The nature of lost evidence cannot be recreated
                by other available means (2nd *Trombetta* Factor).. . . . . . . . . . 24
        (3)     The police acted with bad faith
                (3rd Factor Imposed by *Youngblood*)... . . . . . . . . . . . . . . . . . 27

(B)     Placing Distorted And False Evidence Before
        Judge Lynch And Perhaps The Grand Jury
        Warrants A Remedy. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

(C)     The Court Should Order The Government To Explain
        Why It Charged The Case By Unsealed Complaint
        And Absent Satisfactory Explanation The Case
        Should Be Dismissed Because Defendant Will
        Never Have A Fair Trial.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

(D)     The Government Should Have To Prove
        A Nonvindictive Motive for Charging Defendant
        With First Degree Murder And Absent Such
        A Showing That Charge Should Be Dismissed. . . . . . . . . . . . . . . . . 42

Federal Defenders of Montana
125 Bank Street, Suite 710
Missoula, Montana 59802
(406) 721-6749

(E)     The Court Should Inquire Whether This Case
        Has Been Overcharged And If So Fashion A Remedy. . . . . . . . . . 43

IV.   FINAL ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

V.    CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

VI.   CERTIFICATE OF COMPLIANCE. . . . . . . . . . . . . . . . . . . . . . . . . . 47

VII.  CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

# <u>TABLE OF AUTHORITIES</u>

Page No.

## TABLE OF CASES

*Anderson v. United States*,
     318 U.S. 350 (1943). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Arizona v. Youngblood*,
     488 U.S. 51 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 27

*Bank of Nova Scotia v. United States*,
     487 U.S. 250 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Beck v. Washington*,
     369 U.S. 541 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Bordenkircher v. Hayes*,
     434 U.S. 357 (1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*California v. Trombetta*,
     467 U.S. 479 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22, 24, 27

*Miranda v. Arizona*,
     384 U.S. 436 (1966). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 34

*Pittsburgh Plate Glass Co. v. United States*,
     360 U.S. 395 (1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Rideau v. Louisiana*,
     373 U.S. 723 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Sheppard v. Maxwell*,
     384 U.S. 333 (1966). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Stirone v. United States*,
     361 U.S. 212 (1960). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*United States v. Alvarez-Sanchez*,
    511 U.S. 350 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*United States v. Andrews*,
    612 F.2d 235 (6th Cir. 1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*United States v. Butler*,
    567 F.2d 885 (9th Cir. 1978) (Ely, J. *concurring*). . . . . . . . . . . . . . . . . . . 25

*United States v. Dionisio*,
    410 U.S. 1 (1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*United States v. Frederick*,
    78 F.3d 1370 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*United States v. Jenkins*,
    504 F.3d 694 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*United States v. Jingles*,
    702 F.3d 494 (9th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*United States v. Loud Hawk*,
    628 F.2d 1139 (9th Cir. 1979) (*en banc*) . . . . . . . . . . . . . . . . . . . . 24, 32

*United States v. Morell*,
    524 F.2d 550 (2nd Cir. 1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*United States v. Remington*,
    208 F.2d 567 (2nd Cir. 1953). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*United States v. Robertson*,
    15 F.3d 862 (9th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*United States v. Robertson*,
    514 U.S. 669 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*United States v. Ruesga-Martinez*,
   534 F.2d 1367 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*United States v. Sears, Roebuck & Co., Inc.*,
   719 F.2d 1386 (9th Cir. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*United States v. W.R. Grace*,
   526 F.3d 499 (9th Cir. 2008) (*en banc*). . . . . . . . . . . . . . . . . . . . . . . . . 24, 32

*United States v. Williams*,
   504 U.S. 36 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Virgin Islands v. Testamark*,
   570 F.2d 1162 (3d Cir. 1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Wilkinson v. Ellis*,
   484 F.Supp. 1072 (D.Pa 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Wong Sun v. United States*,
   371 U.S. 471 (1963). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

## FEDERAL STATUTES

18 U.S.C. §3501(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

## STATE STATUTES

§46-4-406, Mont. Code Ann. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

§46-4-411, Mont. Code Ann.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

§§46-4-406 through 409, Mont. Code Ann.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Federal Defenders of Montana
125 Bank Street, Suite 710
Missoula, Montana 59802
(406) 721-6749

# LOCAL RULES

Local Rule 47.2(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

Local Rule 5.2(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Local Rule 7.1(d)(2)(as amended). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

Federal Defenders of Montana
125 Bank Street, Suite 710
Missoula, Montana 59802
(406) 721-6749

ANDREW J. NELSON
Assistant Federal Defender
MICHAEL DONAHOE
Senior Litigator
Federal Defenders of Montana
Missoula Branch Office
125 Bank Street, Suite 710
Missoula, MT 59802
Phone: (406) 721-6749
Fax:   (406) 721-7751
Email: andy_nelson@fd.org

Attorneys for Defendant

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR 13-37-M-DWM |
| Plaintiff, | |
| vs. | **DEFENDANT'S BRIEF IN SUPPORT OF MOTION TO DISMISS THE INDICTMENT AND ALTERNATIVE MOTION TO STRIKE COUNT I OR FOR OTHER APPROPRIATE RELIEF BASED ON PROSECUTORIAL MISCONDUCT** |
| JORDAN LINN GRAHAM, | |
| Defendant. | |

## I.  INTRODUCTION

Defendant has filed a motion for appropriate relief based on prosecutorial misconduct (Doc. #59).  This brief supports that motion.

## II.  **FACTS RELEVANT TO THIS MOTION**

### *(A)     Pertinent Background And Circumstances*

Jordan Graham and Cody Johnson knew each other a little less than two years before they married.  Cody proposed in December of 2012.  The wedding celebration was held the following June 29th at Woodland Park in Kalispell, Montana.  About 90 people attended, mostly friends and family from the Baptist church where Jordan and Cody spent just about every Sunday.   Eleven days later on July 11th Jordan, accompanied by a small group consisting of her mother, her brother and two friends, went to Glacier National Park to look for Cody, who had been reported missing July 8th just about one week after the wedding.[1]

Jordan wanted to check a popular spot in the park known as "The Loop" because Cody visited the park frequently and liked the area.  There is a deep ravine near the parking lot, and Jordan climbed around several steep places looking for a better view into the ravine.  After some searching she yelled back to the others that she thought she could see what looked like a body at the bottom of the ravine.  At her mother's urging, her brother Michael climbed down to where Jordan was and also

---

[1]It merits emphasis that the evening before [July 10th] Jordan likewise went to the same site with other friends.  Those friends dissuaded Jordan from climbing down the ravine that night so Cody's body was not discovered until the next day.

saw what he thought was a body down below. Unfortunately, that body turned out to be Cody's. Since Cody had previously been reported missing to the Kalispell Police on the evening of July 8th, Jordan twice told detectives in the ensuing days Cody had left in a dark vehicle with unknown friends on the night of July 7th. Thus Jordan quickly became the object of suspicion due to the obvious inconsistency between her leading others to the situs of Cody's body, while at the same time having claimed no knowledge of Cody's whereabouts.

### (B)    *Jordan Is Summoned To The Kalispell Police Department For Investigation.*

About a week after Jordan disclosed the location of Cody's body she was summoned to the Kalispell Police Department (KPD) by Detective Melissa Smith. Jordan and Detective Smith were not strangers. After Cody had been reported missing, Detective Smith took a lead role in the investigation. The two had talked about Cody's disappearance and specifically Jordan's initial claim that Cody had left the area in a mysterious car. But after Jordan facilitated the recovery of Cody's body Detective Smith understandably began to doubt the truth of Jordan's previous statements. Jordan arrived at the KPD on July 16, 2013 at around 3:30 in the afternoon expecting she would again be dealing with Detective Smith. However, Jordan was quickly introduced to Agent Stacey Smiedala of the FBI. According to Agent Liss, Agent Smiedala was called in to assist because he is an experienced

polygrapher and skilled in the art of interrogation. (Detention Hearing Transcript at page 18; Addendum page 18).

### (C) Agent Smiedala Conducts Unrecorded Pre-interview With Jordan

Jordan was escorted to a KPD interview room by Detective Smith and introduced to Agent Smiedala. The three sat around a small table. After a brief conversation, Smith left the interview room. Agent Smiedala then had Jordan sign consent forms agreeing to speak without an attorney present and to submit to a polygraph examination. Next, Agent Smiedala had Jordan move to a chair on his side of the table telling Jordan he was going to treat her just like he would his own daughter. For the next hour and twenty-five minutes or so Agent Smiedala sat knee to knee with Jordan, who was wearing shorts. Agent Smiedala kept one hand on Jordan's knee and his face close to hers. When Jordan moved her chair back, the agent moved his forward to maintain the close proximity of his face to hers, and keep his hand on her knee.

This first hour and twenty-five minutes of Jordan's interrogation went unrecorded despite the fact that both audio and video equipment was available for that purpose. Under state law all interrogations must be video recorded.[2] Thus, regrettably, we are missing the subtle way critical word choices by Jordan were changed by the agent. For example, every time Jordan talked about her "emotions" Agent Smiedala changed that to "anger", until Jordan adopted use of that word in her subsequent recorded statements. Furthermore we are missing a critical re-enactment of the accident where Jordan stood and demonstrated what happened on the ledge at Agent Smiedala's request, with the agent playing Cody's role during that demonstration. (Doc. #56; Addendum at pages 71-75).

*(D)* *Jordan's First Recorded Statement With Special Agent Smiedala*

After Agent Smiedala finished the lengthy unrecorded phase of Jordan's interview, he asked her to return to her previous seat on the other side of the table and invited Detective Smith back into the room. Then at approximately 5:28 p.m. Agent Smiedala began recording a summary of some of what Jordan told him during the previous unrecorded session. This recorded interview lasted twelve minutes, and did

---

[2]Under Mont. Code Ann. §46-4-406 through §46-4-411 all interrogation sessions must be electronically recorded when conducted in a place of detention. Jordan's prior interview sessions with the KPD were recorded under these provisions.

not include video taping, only audio.  Agent Smiedala focused on several key points during this recorded summary statement:

**1)      Jordan describes having the "wedding blues."**

Jordan:              *I was just kind of feeling like maybe. . . we should have waited a little bit longer.  I still wanted to get married to him.  I mean. . .I, I. . . still to this day even though he is not here, I am still in love with him.*

\* \* \* \*

Agent Smiedala:    *Okay.   And was there any consideration at your point, and I need you to be 100% honest with me at this moment, because I know you were scared and, know that you know, um, that things were getting pretty heated, okay, and you had that whole week of saying to yourself, ew, do I really want to be married?  Okay.  Type of thing.  Did it feel as if maybe some way just to clear yourself of this situation?*

Jordan:              *I don't really understand that question.*

Agent Smiedala:    *By, by pushing him?  Did you feel like it was maybe a way, oh just like ah, this is a way to take care of this and get me out of this situation?*

Jordan:              *No, no.  I didn't want to not be with him.  I still wanted to be with him and have a life with him.*

Agent Smiedala:    *Okay.*

Jordan: I mean, I still, I still wanted to be married and just kind of see if it would get better in time. I didn't want to get divorced, but I mean, I didn't want to not have him for the rest of my life.

**2)    The progression of the argument between the couple during the evening.**

Jordan: So we had gone to church. . . and then came home and were kinda of getting into a little argument . . . So we were still kinda arguing about things, and he tried to hold me down. I said, "you know that is not okay, you're not going to do that." But I didn't try to defend myself at that point so he was like, "well let's go for a drive."

*    *    *    *

Agent Smiedala: Ok. Alright. So, and, and so at some point, you guys end up at this spot, okay. And you walk the other path first, and it's, it's kind of a heated argument and then you end up on this other side where there is this drop off. . . there um and, you had told me earlier that you felt like, um, you felt some anger?

Jordan: Yes.

Agent Smiedala: Okay. Because he wasn't what, telling you what you wanted to hear or?

Jordan: He was just kind of blowing it off, like I don't really know how to say it. Like I was just making things up and trying to make him mad or whatever.

Agent Smiedala: OK.

| Jordan: | Like I was just trying to start something I guess. . . |
|---|---|
| Agent Smiedala: | Were you? |
| Jordan: | No.  I wanted to tell him what I felt so that he knew, so that I wasn't just kinda pretending to be happy for him, and make me unhappy . . . |
| Agent Smiedala: | Was he, did you feel like he was maybe treating you as a child? |
| Jordan: | I did, yes. |
| Agent Smiedala: | Yes, (inaudible). |
| Jordan: | Talking AT me and not to me. |
| Agent Smiedala: | Kinda just being. . .ah, somewhat of a jerk? |
| Jordan: | Like I was, like I was, like, like a five year old.  Like he was trying to talk to a five year old. |

\* \* \* \*

| Agent Smiedala: | Right.  Okay.  So an emotional situation that just turned very bad.  Is that the best way to describe it? |
|---|---|
| Jordan: | Definitely.  Very.  The most emotions, were higher than I have ever experienced. |

### 3) How Jordan and Cody ended up on the ledge.

| Jordan: | . . . And he said, and we were standing there and he said, and I didn't want to do that trail because I was afraid that, I mean there is a cliff right there. |
|---|---|
| Agent Smiedala: | un huh. |

| | |
|---|---|
| *Jordan:* | *And you could fall. And he said "I could do this with a blind fold on." And he said, "I could just put it on, take a step but I wouldn't even fall." And I was like, and it just kept going through my head that, um, you are going to fall or something.* |

## 4) How Cody fell from the ledge.

| | |
|---|---|
| *Jordan:* | *And then we were arguing some more and he went to grab my arm and my jacket and I said "no." I said I am not going to let this happen to me, I am going to defend myself. So I kinda, said "let go" and I pushed, and he went over.* |

\* \* \* \*

| | |
|---|---|
| *Agent Smiedala:* | *Okay. And so at some, I mean, you are angry, you are feeling emotional and he wasn't treating you probably the way that you deserved to be treated, okay, um, where did you, did you push with one hand or two hands?* |
| *Jordan:* | *No. I took two and I just pushed, like to get him off me, like pushed. It was, it was two hands.* |
| *Agent Smiedala:* | *Okay. And where were your hands at on his body?* |
| *Jordan:* | *They were like. At first I grabbed him over and like pulled and then pushed on the back.* |
| *Agent Smiedala:* | *Okay. So you got his arm off of you first?* |
| *Jordan:* | *Yes.* |

Agent Smiedala:   That is what you just showed me here when you were showing me. So you knocked his arm off and then you pushed him. Did you forget where you were at? Or did you just decide I just wanted to make this right?

Jordan:   No. It was just kind of a quick thinking, like get off me! Like I wasn't even thinking that could be over. I guess I was just thinking in my head, just get off is what I was thinking.

## 5)   There was no plan or intention to kill Cody.

Agent Smiedala:   Um, okay. Um, did you, did you, did you plan any of that before you went up to Glacier Park?

Jordan:   No. I did not.

Agent Smiedala:   That is just something that just occurred because of the, because of the situation?

Jordan:   I didn't even want to go up to the Park. No, I wanted to stay home and talk about things.

Agent Smiedala:   Okay and just kinda the, the heat of the moment. Do you, and I guess this is an important question, do you feel responsible for his death?

Jordan:   In a sense, I mean being that I was the last one that pushed even though I, 100% did not do that on purpose, I, I, I mean I don't feel like. . . I killed him? I mean, I did push.

Agent Smiedala:   Uh huh.

Jordan:   But it was kinda of an act of self defense. So

| | |
|---|---|
| Agent Smiedala: | Okay. |
| Jordan: | I mean, never was planned, no, I would never ever, ever plan on to do that to anybody. |
| Agent Smiedala: | Right. |
| Jordan: | I couldn't. |
| Agent Smiedala: | Do you think you lost track of where you were at on the, on the mountain? |
| Jordan: | Yeah.  I think I didn't realize that one push would mean for sure you were over. |

\* \* \* \*

| | |
|---|---|
| Agent Smiedala: | Okay.  And so again I just want to re-clarify a few points okay.  There was no planning on your part to kill, to kill Cody? |
| Jordan: | No. |
| Agent Smiedala: | Okay.  You hadn't planned that.  You didn't tell, this whole thing just kinda happened in the heat of . . . |
| Jordan: | Yeah. |
| Agent Smiedala: | In the heat of emotion of the passion of that situation.  Okay. |

**6)** **Jordan lied to law enforcement officers multiple times prior to July 16, 2013.**

Agent Smiedala:    Okay. And you have been interviewed by the police at least multiple times, I don't know exactly how many times, okay, up to this point and you never told them this.

Jordan:    No.

Agent Smiedala:    Why not?

Jordan:    I was afraid that they weren't going to give me a chance to explain things and they were just gonna kind of put me in hand cuffs and take me away right there and say that I had committed a crime or that I had planned this to kill somebody.

Agent Smiedala:    Okay. But did they tell you they were going to do that or did you just assume that?

Jordan:    No. That's just from my (inaudible). Things that I have. . . television.

**(E)** **Agent Smiedala Consults With Others About The Need For Further Questioning And About Arresting Jordan**

Agent Smiedala turned off the tape recorder at 5:40 p.m. and left the room for about fifteen minutes, leaving Detective Smith and Jordan sitting together. When Agent Smiedala returned he was holding a piece of paper with what appeared to be additional questions written on it. Agent Smiedala's post interrogation report does not mention who he consulted with during the break, and we are unaware of any

substantive report Agent Liss prepared detailing his contacts with Agent Smiedala, Detective Smith and/or Jordan on that date. Likewise Detective Smith did not prepare a report memorializing her contact with Jordan and the FBI agents on July 16, 2013.

**(F)    *Jordan's Second Recorded Interview With Agent Smiedala***

Agent Smiedala turned the tape recorder back on at 5:55 p.m. For the next ten minutes, he asked Jordan a series of questions focusing on specific elements of crimes.

**1)    Motive.**

*Agent Smiedala:*    *Um, was Cody wearing his wedding ring when he fell off the cliff?*

*Jordan:*    *Yes. He had it on. I didn't let him take that ring off.*

*Agent Smiedala:*    *Okay.*

*Jordan:*    *He was wearing it.*

*Agent Smiedala:*    *Okay. So he didn't take it off, throw it or lose it?*

*Jordan:*    *No. He was wearing his ring.*

*Agent Smiedala:*    *So somehow he lost the ring from the time he fell off the cliff.*

*Jordan:*    *Yeah, but uh, I. . . he was for sure wearing his ring.*

**\* \* \* \***

Agent Smiedala:     Okay.  Alright.  Did you feel like you made the wrong decision?

Jordan:     In getting married at that time?  I felt like I shouldn't have gotten married at that time, but not, there were not any issues of being with Cody, no.  I feel like he's the person I was going to spend the rest of my life with.

Agent Smiedala:     So would it be fair to say that during that week you were having second thoughts about all this?

Jordan:     Yeah.  And then kinda wanted to wait.

*  *  *  *

Agent Smiedala:     Okay.  So there was probably no chance of him assaulting you at that point, or anything like that.

Jordan:     Not, uh, as far as I know.  I have never seen him that upset before though.  Like I don't . . . never seen him that upset, beyond that point.

Agent Smiedala:     And the worst thing that he had ever done to you at that point was just restrain you?

Jordan:     Yeah and held me down, but there was no way I was moving.

Agent Smiedala:     Oh, okay. Alright.

Jordan:     He was right on top of me.

Agent Smiedala:     So if he was probably going to do anything that day, I mean going along with what he had done in the past, he was probably going to restrain you.

| | |
|---|---|
| *Jordan:* | *Yeah. Just hold me there and not let me move.* |
| *Agent Smiedala:* | *And you didn't want to be restrained.* |
| *Jordan:* | *No. I didn't want to be restrained.* |

## 2)   Jordan's Intent.

| | |
|---|---|
| *Agent Smiedala:* | *Okay. And you guys were at Dairy Queen talking about a big surprise. What was that about?* |
| *Jordan:* | *I wanted to kinda plan something for him, I know the stress he was under and we'd gone through so much to plan this wedding and, I mean we. . . he proposed in December and we got married in June so it wasn't like we had a year to plan. And I could tell that he just needed a break and so he always wants all of his friends to be around him and I just want to plan a big barbeque with all his friends involved, just come and just kind of surprise him and show him that you know, I was still there for him and I loved him. I wanted to do something for him.* |

\* \* \* \*

| | |
|---|---|
| *Agent Smiedala:* | *Okay. Alright. Now Lastly, I want to cover with you. So you and Cody are standing on this cliff.* |
| *Jordan:* | *Uh huh.* |
| *Agent Smiedala:* | *Okay. And at some point you guys are arguing of course.* |
| *Jordan:* | *Yes.* |
| *Agent Smiedala:* | *And he grabs your arm.* |

| | |
|---|---|
| *Jordan:* | *Uh huh* |
| *Agent Smiedala:* | *Why does he grab your arm?* |
| *Jordan:* | *I don't know. I mean I feel maybe he thought . . . I don't know why he grabbed my arm, but I thought that he was going to like pull me, or try to hold me over, cause his instincts seemed to be when he is mad is to pull and to grab.* |
| *Agent Smiedala:* | *Okay. Were you walking away from him, was that what this, was going on? Kinda like he had done in the past?* |
| *Jordan:* | *No. I wasn't going to walk away. I mean maybe he thought I was going to. And the other time I wasn't going to walk away either. He just, that thought process, to him, maybe that I was going. . . .* |

\* \* \* \*

| | |
|---|---|
| *Agent Smiedala:* | *Okay. Alright. So it was fair for him to probably assume you were probably going to walk away?* |
| *Jordan:* | *Uh huh.* |
| *Agent Smiedala:* | *Possibly?* |
| *Jordan:* | *Possibly, yes.* |
| *Agent Smiedala:* | *And at some point you, as he grabbed your arm, you knocked his arm off of your arm?* |
| *Jordan:* | *I pulled it off. Yeah, I grabbed his hand and I like pulled him . . .* |

| Agent Smiedala: | Okay. So you pull him off. At that point couldn't you have just walked away from him? |
|---|---|
| Jordan: | Yes. Looking back, I mean, like, I guess I could have. |

### 3) False Statements to Officers.

| Agent Smiedala: | Okay. Alright. And you were interviewed how many times by the police department, uh, regarding this matter since Cody's death? Roughly? |
|---|---|
| Jordan: | Uhmm. At least. . . I think at least two or three probably. I came in on Monday, I came in. . . and then they turned it over. . .and I talked to Detective Clark. . . . |

\* \* \* \*

| Agent Smiedala: | Okay. So it is fair to say that each one of those statements to the Detectives and the Forest Rangers and stuff you gave a false statement? |
|---|---|
| Jordan: | Yes. That is true. |

**(G)** ***The Recorder Is Turned Off And Jordan Is Asked More Questions. The Decision Is Made To Release Jordan.***

Sometime after the second recorded statement ended, Jordan was asked to draw a picture of the ledge Cody fell from. She was also asked to identify a photograph of a car entering Glacier National Park, apparently acquired from some type of webcam, on July 7, 2013 at 9:17 p.m., which she did. There is no report detailing what else may have been discussed with Jordan after the recorder was turned off the second

time. We do know however that although Jordan agreed to take a polygraph examination, none was conducted. Agent Smiedala, whose instruments were set up in the interview room ready to go, apparently determined no polygraph test was necessary.

> *Agent Smiedala:*     *Okay. And I again I want to thank you for coming in and uh, giving me a statement that I now think is 100 percent of the truth.*

At the conclusion of the interrogation it was decided that Jordan would not be arrested.

### (H) Agent Liss Prepares Complaint Affidavit For Second Degree Murder Two Months Later (Doc. #1-1; Addendum at 104-108).

Section "f", the crucial section of the complaint affidavit, took portions of responses to hypothetical questions put to Jordan by Agent Smiedala, ignored or misstated other parts of her statement, and utilized several key sentences that are a complete distortion of what Jordan actually said. Agent Liss appears to have authored the complaint based on a slightly longer than one page typed report prepared by Agent Smiedala, in which he purports to summarize more than two hours of interviewing, questioning and observations of Jordan Graham. Had he been present for Jordan's interrogation Agent Liss could never have written the critical section "f" of the complaint affidavit.

Section "f" recites that on July 7, 2013 Jordan and Cody were arguing, so "both had decided to go to Glacier National Park." Jordan's statement clearly states it was Cody's idea to go and she wanted to stay home. Part "f" goes on to state: "At one point in time during their arguing Graham turned and began to walk away." Jordan's statement was exactly the opposite, she wasn't trying to walk away, Cody grabbed her arm. There was some conjecturing on Agent Smiedala's part that perhaps Cody may have *thought* she was going to walk away, but that was merely a hypothesis floated by the agent, where in actuality Jordan was not walking away when Cody grabbed her.

Section "f" goes on to claim that "Graham turned and removed Johnson's hand from her arm. After removing Johnson's hand from her arm, Graham stated she could have just walked away, but due to her anger, she pushed Johnson with both hands in the back and as a result, he fell face first off the cliff." This is by far the most damming sentence in the complaint, and the most often quoted in the news media. However, this statement is a complete fabrication, found nowhere within the recorded statements of Jordan Graham. Jordan clearly told Agent Smiedala that the movement to free her arm and the push that resulted in Cody falling off the ledge was one continuous motion, which Jordan demonstrated. In her first recorded statement Jordan said she told Cody to "let go" and she pushed and he went over, all in one

motion. Later in that same taped statement she described it again as one motion, stating "I took two and I just pushed, like to get him off me, like pushed. It was, two hands." Adding "It was just kind of quick thinking, like get off me!" She later added she never intended for Cody to fall off the ledge, had not planned it, and never realized that action would result in her husband's death.

**(I)** ***Jordan Is Released On Conditions Over The Government's Objection And Jordan Is Indicted For Both First And Second Degree Murder.***

On the basis of the complaint affidavit, which the government failed to request be sealed, Jordan was arrested. She appeared before Judge Lynch on September 9, 2013 and stipulated to detention reserving the right to request a hearing, assuming she could put together a release plan that might satisfy the Court. The next day Jordan filed a motion for release on conditions which Judge Lynch promptly entertained and granted in a written order. (Doc. #9). The government appealed and this Court likewise called a prompt hearing and Judge Lynch's order was affirmed. (Doc. #16).

### III. <u>ARGUMENTS</u>[3]

(A)     *The government failed to preserve evidence and violated defendant's due process rights.*

The government denies the defendant's due process rights when it fails to preserve evidence "expected to play a significant role in the suspect's defense." *California v. Trombetta*, 467 U.S. 479, 485 (1984). According to *Trombetta*, the lost evidence in question must display two characteristics. First, it must possess an exculpatory value that was apparent before the evidence was destroyed or went unpreserved; and, second, the evidence must be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means. (*Id*. at 89). Moreover, four years after *Trombetta* the Supreme Court further clarified that where a defendant seeks relief for the destruction of exculpatory evidence he must be prepared to show "bad faith on the part of the police." *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988).

In sum, in order to obtain relief for the failure to preserve or the destruction of evidence the defense must make three showings:

---

[3]The order for these arguments corresponds to the lettered <u>GROUNDS</u> set forth in defendant's motion (Doc. #59). Thus argument (A) supports ground (A), (B) supports (B) and so on.

- The evidence had antecedent exculpatory value apparent before the evidence was destroyed or went unpreserved.

- The nature of the lost evidence is such that the defendant can't recreate it by other available means.

- The police acted with bad faith.

We now examine each of these factors in the same order.

**(1)    *Apparent antecedent exculpatory value (1st Trombetta Factor).***

At the time of Jordan's interrogation on July 16th she had given conflicting accounts concerning Cody's whereabouts. On the one hand Jordan said that Cody had left the area with others in a car unfamiliar to her. However, in the days immediately following that report Jordan took family and friends to Cody's body so it could be recovered. Thus, considering those conflicting accounts any reasonable law enforcement officer in these circumstances would have been acutely aware of both the potential inculpatory and exculpatory value of Jordan's initial statements, reactions and/or demeanor in the context of the interrogation scheduled for July 16th.

Considering the setting, it had to be apparent that Jordan really had only two options open to her at the commencement of Agent Smiedala's interrogation: i) stick with her previous false story that Cody had mysteriously disappeared in a car with people she did not know; or ii) come clean and admit that she was on the ledge with Cody that fateful Sunday evening. Suffice it to say Jordan's previous prevarications,

which she would explain were made out of panic that no one would ever believe her, obviously rendered Jordan "the" number one suspect in Cody's death when she walked into the KPD on July 16th.

During this initial and most critical interrogation session Jordan began by sticking to her original story that Cody mysteriously disappeared with others. Yet in pretty short order Jordan admitted that her previous statements about Cody's disappearance and whereabouts were indeed false. However, since we have no audio or video recording of the session we cannot determine how long it took Jordan to admit her previous fear based coverup, and/or Jordan's demeanor or emotional condition when she admitted that she was on the ledge with Cody that night. Gone forever is Jordan's first time, spontaneous, unrehearsed version of the events on the ledge, as well as her explanation of why she felt she had to lie about what happened. Such evidence, had it been preserved, qualifies as evidence that had antecedent, exculpatory value.

In her declaration (Doc. #56; Addendum pages 71-75) Jordan states that during the unrecorded phase of her interview Agent Smiedala questioned her repeatedly asking how things happened and why. She further states that although she was doing her best to tell him the truth the agent never seemed quite satisfied with what she was saying and consistently rephrased what she had said, often in words different from the

words that Jordan herself was using. According to Jordan she tried to convey to the agent that the events on the ledge were a terrible accident, followed by a fear and a panic that no one would ever believe her side. There is simply no denying the overall exculpatory value of such an account; not to mention that all of Agent Smiedala's interrogation techniques during the unrecorded session will never be assessed by the trier of fact.

(2)    *The nature of lost evidence cannot be recreated by other available means (2nd Trombetta Factor).*

Jordan's first, unabridged version of events cannot be recreated. In the wider context of the whole investigation, that initial one hour and twenty five minutes had characteristics so unique there is no post hoc process capable of reconstructing the crucial dynamics that undoubtedly occurred during that original session. And this is especially true where, as here, the prime suspect in what law enforcement suspected was a homicide both admits that she has previously told false stories and risks a demonstration for the interrogator in order to describe what actually occurred. *See e.g. United States v. Loud Hawk*, 628 F.2d 1139, 1151-1156 (9th Cir. 1979) (*en banc*) (Kennedy, J. *concurring* at page 1152, *overruled on other grounds by United States v. W.R. Grace*, 526 F.3d 499, 505-506 (9th Cir. 2008) (*en banc*) (government's culpable conduct in losing or destroying evidence may warrant remedy in some

circumstances to deter future violations and protect judicial integrity based on only a plausible suggestion of prejudice or none at all); *see also United States v. Butler*, 567 F.2d 885, 892 (9th Cir. 1978) (Ely, J. *concurring*) (government is responsible for conduct of its agents, as agents are "an arm of the prosecutor," *quoting, United States v. Morell*, 524 F.2d 550, 555 (2nd Cir. 1975).

Of course we expect that the government will argue that adequate substitutes do exist for Jordan to recreate her initial one hour and twenty five minute session with Agent Smiedala. So with that expectation in mind we now preemptively examine some of the likely substitutes the government may propose. First the government may suggest that Jordan is free to testify before the jury to relate her version of the unrecorded session. This is an inadequate substitute. Being examined by a set of lawyers (defense and prosecution) in no way even remotely resembles the atmosphere of a "surprise" interrogation session conducted by a skilled FBI Agent. The pressures on the suspect and the tactics employed by the questioner during such an interrogation pale in comparison to the regulated atmosphere of a jury trial where counsel are obliged to adhere to the orders of the court and the rules of evidence. The mere act of taking the witness stand in a courtroom full of people, especially in a case such as this that has garnered substantial attention, in no way compares to the intimacy of an interrogation.

If the Court finds, as we argue, Jordan's initial unrecorded session with Agent Smiedala was just a deliberate tactic by the agent to "shape" Jordan's later recorded statements, there is just no reason to think that Jordan's in court testimony would have the same impact as would watching her on a video emotionally admitting for the first time that she had lied out of panic and fear; and that she instinctively and accidentally pushed Cody off the ledge after he tried to grab her. Jordan states in her declaration, her first session with Agent Smiedala was an unvarnished account of what happened and why, thus the spontaneity of that rendering has been permanently lost. Furthermore, that spontaneity is surely not contained in the subsequent audio recorded statements taken by Agent Smiedala where he carefully guides Jordan's account into an ambiguous statement, that at best leaves Jordan admitting to some form of manslaughter, or worse murder.

Another government suggestion might be to agree to read a stipulation to the jury wherein the government admits that it should have recorded all of Jordan's statement. However, that bare admission would not serve to recreate the evidence; and in any event such a remedy would be unequal to the gravity of the violation. Unless of course the stipulation makes it unmistakably clear that failing to record all of Jordan's statement was part of a grand, government strategy designed to avoid creating a complete electronic record of the interrogation. Hence defendant

respectfully submits that her case meets the second *Trombetta* factor because the lost evidence cannot be re-created by other suitable means.

**(3)** ***The police acted with bad faith (3rd Factor Imposed by Youngblood)***.

The art of statement taking by law enforcement has no doubt achieved the stature of a speciality. Through deliberate tactics like isolation and emotional and psychological coercion these highly trained statement takers have one goal in mind: managing the outcome of the interrogation to produce a "voluntary" statement that will contain admissions by the accused touching on each and every element of the contemplated charge, which unsurprisingly often turns out to be potentially the highest degree of offense that could be charged in the circumstances.

As relevant here the defendant was summoned to the KPD by Detective Smith, who had previously conducted at least one other recorded interview of Jordan in connection with Cody's disappearance. Apparently after Jordan had disclosed Cody's whereabouts Detective Smith summoned Jordan to the KPD under the guise of having to tie up some loose ends in her investigation. Obviously seeing the transparent nature of Jordan's conflicting claims of no knowledge of Cody's whereabouts, followed by Jordan's sudden disclosure of Cody's body at the bottom of the Loop's ravine, Detective Smith apparently consulted with FBI Agent Liss concerning how and when to approach Jordan for more information. Recognizing that the situation

might prove to be delicate Agent Liss and Detective Smith enlisted the aid of fellow Agent Smiedala, who has extensive professional training in both polygraphy and suspect interrogation.

On arrival at the KPD Agent Liss was in the building, but by pre-arrangement he did not participate in questioning Jordan. Detective Smith on the other hand greeted Jordan and served as a go between for Jordan and Agent Smiedala. At first, all three (Smith, Smiedala and the defendant) sat together in one of the rooms at the police station. Shortly thereafter Detective Smith left the room. Agent Smiedala read both *Miranda* waivers and consent to polygraph forms, which Jordan signed and dated. Then, according to Jordan, Detective Smith exited the room. The detective's exit supports a finding of bad faith because, as indicated previously, in the context of the KPD investigation all of the sessions with Jordan would have to be electronically recorded. *See*, Mont. Code Ann. §§46-4-406 through 409.

Hence we contend that Detective Smith was invited to leave in order to dispense with the need to record. *Cf. United States v. Alvarez-Sanchez*, 511 U.S. 350, 359-360 (describing scenario where federal and state agents collaborate to obtain a confession), *citing Anderson v. United States*, 318 U.S. 350 (1943). If Detective Smith was dismissed from the room in order to eliminate the duty to record the interrogation session that shows bad faith on the part of law enforcement and the

statement and its fruits should be suppressed in their entirety. *Cf.* 18 U.S.C. §3501(b) ("The trial judge in determining the issue of voluntariness shall take into consideration all the circumstances surrounding the giving of the confession"). *Also see Wong Sun v. United States*, 371 U.S. 471 (1963) (fruits of illegally obtained evidence should likewise be suppressed).

Upon Detective Smith's departure Agent Smiedala had Jordan move to his side of the table on a chair facing him such that Agent Smiedala's knees was touching the defendant's knees. (Doc. #56 at page 2; Addendum at page 72). For approximately the next hour and twenty five minutes Jordan tried to explain her situation. In the interest of brevity we incorporate here by reference much of what Jordan says transpired during that unrecorded interrogation. (Doc. #56; Addendum at pages 71-75). At the conclusion of the unrecorded phase of the interrogation Detective Smith reentered the room but before her reentry Agent Smiedala had Jordan move back to the other side of the table, so that he was no longer in knee to knee contact with her. At that time a tape recorder was activated and Jordan admitted to being on the ledge with Cody and instinctively pushing him in reaction to his grab so that he accidently fell off the ledge. Next Agent Smiedala called for a break and left Jordan in the room with Detective Smith for about fifteen minutes. On his return Agent Smiedala had a sticky note on his fingers that the defendant thought were additional questions. It

is unknown who, if anyone, Agent Smiedala consulted during that interim (Agent Liss? The United States Attorney's Office?); however Jordan got the distinct impression that Agent Smiedala asked more questions when he came back because someone told him to. (Doc. #56 at page 4; Addendum at page 74).

According to Jordan, who has since read the affidavit supporting the complaint, she was clear in her unrecorded statement that Cody's fall over the ledge was very, very regrettable but clearly accidental. (Doc. #56 at page 3; Addendum at page 73). Jordan also says that in her long unrecorded, initial session with Agent Smiedala he convinced her she was angry when she had in reality only claimed being emotional. (Doc. #56 at page 3; Addendum at page 73). Furthermore, insofar as her being able to "walk away" as stated by Agent Smiedala in his summary polygraph report, Jordan never intended to convey that there was some kind of delay or time period between Cody trying to grab her arm and Jordan's instinctive and self-preserving reaction to release Cody's grip. And this, according to Jordan, would have been nowhere more evident than in the first demonstration she gave during the unrecorded session when Agent Smiedala played Cody's role on the ledge.

Without the lengthy unrecorded session of Jordan's interrogation it is impossible to tell exactly what pressures were brought to bear on Jordan during that session. But we do know that by design Jordan was isolated from others, even other

law enforcement. For Jordan, as her declaration reveals, it wasn't so much about her emotional condition on the ledge as it was about Cody grabbing her, which resulted in her instinctive reaction to be released from Cody's grasp. Call it what you will coercion, suggestion, etc., it is evident that in Jordan's two recorded statements Agent Smiedala is insistent that anger and high emotions on Jordan's part were central to the narrative. Yet at one crucial point Jordan somewhat naively confessed that she did not even know what "passionate" meant (Addendum at page 82). On the other hand Agent Smiedala artfully used all the manslaughter buzzwords with the obvious intention of creating a placeholder admission by Jordan that, at a minimum, she acted not instinctively, as she stated in the unrecorded phase of her interview; but with "heat of passion" as required under the manslaughter statute.

Agent Smiedala was indefatigable in planting other buzzwords during the recorded statements: "heated argument"; "you were angry . . . upset . . . it was a passionate situation." All resulting in what by any reasonable interpretation was a hypothetical posed by Agent Smiedala implying, wrongly, that Jordan could have walked away, and did walk away, only to turn around and push Cody off the ledge. The whole recorded part of the interrogation was an epic effort by Agent Smiedala to isolate key words that would at a minimum support a voluntary manslaughter theory; with enough room for the argument that Jordan could have walked away,

which might even support a theory of depraved heart for first or second degree murder.

There is a vast difference between taking a statement from a suspect or a witness and engineering one; and that is a central concern regarding the government's conduct here. To decide this issue the Court should consider whether the evidence was lost or destroyed while in the government's possession. (Here, yes). Whether the government acted in disregard of the rights of the accused. (Here, yes). And whether there was a failure to adhere to reasonable standards for police and prosecutors. (Here, yes). Furthermore, it is relevant to inquire whether the government attorneys prosecuting the case participated in the events leading to the loss of the evidence, since prosecutorial action may reveal an additional motive to harm the accused. *See Loud Hawk*, 628 F.2d at 1151-1156 (Kennedy, J. *concurring at page 1152, overruled on other grounds by W.R. Grace*, 526 F.3d at 505-506.[4]

The "[l]oss or destruction of relevant evidence by the government not only raises general questions of the fundamental fairness of a criminal trial, but may also deny a defendant the right to compulsory process." *Virgin Islands v. Testamark*, 570

---

[4]Specifically we ask that the Court determine who Agent Smiedala consulted during the break he took between the recorded sessions of Jordan's interview. If it was the United States Attorney's Office that fact should be taken into account.

F.2d 1162, 1166 (3d Cir. 1978). In *Wilkinson v. Ellis*, 484 F.Supp. 1072 (D.Pa 1980), the court noted that:

> The destruction of evidence has a uniquely damaging effect on the administration of justice, for once evidence has been destroyed it cannot be retrieved for judicial review. And the destruction is irrevocable, with a concomitant impossibility of vindication by a wronged defendant and an accompany subversion of the public interest in correct, not merely swift, justice.

*Wilkinson v. Ellis*, 484 F.Supp. 1072 (D.Pa 1980)

Here we are pointing out the fact that not only did Agent Smiedala fail to record the first hour and twenty five minutes of the interrogation he also had Detective Smith leave the room thereby disabling her from becoming a witness as well as and removing the state law obligation to electronically record the interrogation session.

(B)   *Placing Distorted And False Evidence Before Judge Lynch And Perhaps The Grand Jury Warrants A Remedy.*

Among the many unique features of this case is the manner in which the government chose to charge it. As discussed above in argument (A) Jordan was questioned by FBI Agent Smiedala on July 16, 2013 nine days after Cody's disappearance. Thus we know for certain that the federal sovereign was actively involved by at least that date, if not before. Having argued above that the government selectively preserved and distorted the evidence we now turn to the next phase of the

investigation leading up to formal charges being brought against Jordan. The discussion here involves two documents: Agent Smiedala's FD-498 (POLYGRAPH EXAMINATION REPORT) (Addendum at pages 109-110) and the AFFIDAVIT IN SUPPORT OF COMPLAINT (Doc. #1-1; Addendum at pages 104-108). These papers were intended to serve as a summary of Jordan's interrogation on July 16, 2013.

In the affidavit supporting the Complaint before Judge Lynch it states:

On July 16, 2013, Graham was interviewed by law enforcement. During the meeting, Graham was advised of her *Miranda Rights* and agreed to cooperate with the investigating agent and detective and provided the following information: Graham admitted she had lied about the death of her husband and had provided multiple false statements to law enforcement and others regarding Johnson's death. Graham stated on the evening of July 7, 2013, she and Johnson had an argument, were upset and both had decided to travel to Glacier National Park to the Trail Loop area. Once there, they walked on The Loop hiking trail for a while and were arguing. They then walked to the other side of the trail to an area that was very steep and proceed down the rocks near a stump. Graham stated their argument intensified. At one point in time during their arguing, Graham turned and began to walk away. She stated Johnson grabbed her by the arm. Graham turned and removed Johnson's hand from her arm. After removing Johnson's hand from her arm, Graham stated she could have just walked away, but due to her anger, she pushed Johnson with both hands in the back and as a result, he fell face first off the cliff.

Doc. #1-1, page 4, paragraph f; Addendum page 107

This rendition of events is misleading and false and apparently adopted from

Agent Smiedala's POLYGRAPH EXAMINATION REPORT.  In her interview on

July 16, 2013 which, again, was only partially recorded, Jordan had this exchange

with Agent Smiedala:

| | |
|---|---|
| SA Smiedala: | *Okay.  Alright.   So it was fair for him to probably assume you were probably going to walk away?* |
| Jordan Graham: | *Uh huh* |
| SA Smiedala: | *Possibly?* |
| Jordan Graham: | *Possibly, yes.* |
| SA Smiedala: | *And at some point you, as he grabbed your arm, you knocked his arm off of your arm?* |
| Jordan Graham: | *I pulled it off.  Yeah, I grabbed his hand and I like pulled him. . .* |
| SA Smiedala: | *Okay.  So you pull him off.  At that point couldn't you have just walked away from him?* |
| Jordan Graham: | *Yes.  Looking back, I mean, like, I guess I could have.* |

Addendum pages 99-100

However, these isolated remarks were made during the second recorded follow

up session that Jordan had with Agent Smiedala after taking a break and discussing

the matter with Agent Liss and/or the United States Attorney's Office.  In point of

fact Jordan repeatedly stressed throughout her interview with Agent Smiedala that she acted instinctively when Cody grabbed her. Furthermore at no time during her interrogation session did Jordan *ever* say that she "turned and began to walk away" as set forth in the Complaint Affidavit. Critically, Jordan said exactly the opposite: "No. I wasn't going to walk away." Therefore the Affidavit is false because there was no intervening period between Cody grabbing Jordan and Jordan instinctively seeking release from his grasp. The government no doubt has the right to collect evidence; and even to fairly interpret and argue the evidence, but it doesn't have the right to manufacture evidence, which Agent Smiedala's polygraph report both intended and accomplished. Moreover, in preparing the affidavit the government no doubt relied primarily on that report which states in part:

> The couple continued to argue and Jordan began to walk away. Cody grabbed her arm, Jordan turned and removed Cody's hand from her arm. After removing Cody's hand from her arm, Jordan admitted she could have just walked away but due to her extreme anger, she pushed Cody with both hands in the back and he fell off the cliff.

> Polygraph Examination Report FD-498 at page 2, first paragraph

This summary is simply not a fair characterization of what Jordan said in her interrogation sessions with Agent Smiedala. At best this synopsis is a decontextualized, exaggerated interpretation that was intended to distort and contradict what Jordan actually reported. Had Judge Lynch known all of what Jordan

explained to Agent Smiedala (which of course was impossible since only part was recorded) the outcome of the Complaint process may have been different.

After the arrest warrant was issued on the Complaint for second degree murder the government waited for the next grand jury (about two weeks) which returned an Indictment for both first and second degree murder. However, at this writing the government has not disclosed in discovery any evidence supporting the element that Jordan acted with the requisite premeditation for first degree murder. However, on October 25, 2013 in a telephone conference with defense counsel government counsel told the defense for the first time that premeditation may be proved because the government now believes Jordan placed a blindfold on Cody before pushing him off the ledge. In support of this new theory the government is awaiting DNA test results being run on a piece of cloth found on a shoal in the river in the same general vicinity as where Cody's body was recovered. The cloth (the alleged blindfold) was sent to the DNA lab in Quantico, Virginia on or after October 2, 2013, about ten weeks after it was collected from the river and tagged. The defense has yet to be furnished with any type of DNA report and the government has not included a DNA witness on its

witness list that the Court ordered.[5]

In combination the government's failure to record all parts of Jordan's interrogation; the willingness to distort Jordan's interrogation to justify more significant charges; and the government's eleventh hour premeditation theory that Cody was blindfolded, each and all raise very serious concerns. If, as is stated in the complaint affidavit, Jordan and Cody were arguing intensely on the ledge it hardly seems plausible that the argument would cease abruptly so Jordan could apply a blindfold. Frankly at this point the defense has no idea of how the government intends to try this case before the petite jury and likewise has grave doubt about what was put before the grand jury.

The grand jury is intended to serve as a "protective bulwark standing solidly between the ordinary citizen and an overzealous prosecutor." *United States v. Dionisio*, 410 U.S. 1, 17 (1973). Hence the constitutional entitlement to a grand jury Indictment rests on the principle "that a man [must] be indicted . . . [in order] to limit his jeopardy to offenses charged by a group of his fellow citizens acting independently of either the prosecuting attorney or judge." *Stirone v. United States*,

---

[5]Although in the last batch of discovery that we received on November 4, 2013 (after the discovery deadline of October 31, 2013) the government did include the Curriculum Vitae of a DNA person from Virginia.

361 U.S. 212, 218 (1960). If however the grand jury is vulnerable to prosecutorial manipulation it becomes, in the words of Judge Learned Hand, nothing but an "effective tool of tyranny." *United States v. Remington*, 208 F.2d 567, 573 (2nd Cir. 1953). For this reason the prosecution has a responsibility to deal with the grand jury in a manner that promotes the wise exercise of its investigatory powers. *United States v. Sears, Roebuck & Co., Inc.*, 719 F.2d 1386, 1389 n. 3 (9th Cir. 1983). Moreover, dismissal of an Indictment on constitutional grounds is warranted where prosecutorial misconduct undermined the grand jury's ability to make an informed and objective evaluation of the evidence presented to it. 719 F.2d at 1391.[6]

At this writing trial is only one month away and it is not clear to the defense what the government's essential theory is. At first we thought that the government's allegation was that Jordan displayed a reckless indifference for Cody's life by walking away from a heated argument, only to return to the scene after an opportunity

----

[6]To be clear defendant is not relying on this Court's supervisory powers to argue for dismissal because the Supreme Court has clearly stated in *United States v. Williams*, 504 U.S. 36 (1992) that such powers do not extend to the grand jury. However that boundary on judicial "supervisory powers" in *Williams* does not alter or affect the constitutional analysis to be applied under the due process and grand jury clauses. It is still the law that where prosecutorial misconduct generates "grave doubt that the decision to indict was free from such substantial influence, the violations cannot be deemed harmless." *Bank of Nova Scotia v. United States*, 487 U.S. 250, 263-264 (1988).

for reflection to push Cody off the ledge and into the ravine. Unfortunately this theory rests on Jordan's interview with Agent Smiedala which, for reasons already stated, is unreliable. However despite the unreliable nature of Jordan's initial interview, or maybe even because of that, the government recently asserts that somehow Jordan blindfolded Cody and then pushed him off the ledge. These conflicting theories for guilt raise three concerns.

First, was the blindfold theory put to the grand jury? From what we know the alleged blindfold was not sent to Quantico, Virginia (the FBI lab) until October 2nd or later; this would suggest that the blindfold theory was not put to the grand jury at all. Second, was the blindfold theory put to the grand jury in addition to the theory that Jordan walked away and after reflection returned to push Cody off the ledge? Which gives rise to the third problem: did the grand jury charge each theory in the alternative? Since we have no DNA report on the alleged blindfold the defense has proceeded on the theory that the government's case rests on the statements that Jordan made to Agent Smiedala, which we contend are incomplete, coerced and subject to suppression. If on the other hand the government intends to try this case on the blindfold theory, and not on Jordan's statements to Agent Smiedala, the defense is unprepared to meet that contingency and will have no choice but to move for a continuance, which we recognize would be anathema to the Court.

Accordingly, the Court should determine the government's theory of the case by examining the grand jury minutes, at least *in camera*. *See Pittsburgh Plate Glass Co. v. United States*, 360 U.S. 395, 400 (1959) (if defense shows "a particularized need" for disclosure grand jury minutes can be examined). If no blindfold theory was put before the grand jury the government should be prohibited from arguing same during trial because that would deny the defendant her right to be tried on the Indictment that the grand jury returned. *See United States v. Jingles*, 702 F.3d 494, 501 (9th Cir. 2012) (constructive amendment of indictment requires reversal). Further, if the government's sole theory for first degree murder rests on Jordan's statements to Agent Smiedala Count I should be stricken for all the reasons set forth in defendant's Argument sections (A) and (B).

(C)   *The Court Should Order The Government To Explain Why It Charged The Case By Unsealed Complaint And Absent Satisfactory Explanation The Case Should Be Dismissed Because Defendant Will Never Have A Fair Trial.*

Under the reasoning of the Supreme Court in *Rideau v. Louisiana*, 373 U.S. 723 (1963), *Beck v. Washington*, 369 U.S. 541 (1962) and *Sheppard v. Maxwell*, 384 U.S. 333 (1966) the government should be ordered to show cause why, if any there is, it chose to arrest defendant on an unsealed complaint that contained allegations not supported by the evidence of defendant's complete statement taken by Agent Smiedala. Here defendant alleges that the government well knew before it filed the

Complaint that it was very likely that both the allegations and the alleged evidentiary

basis for the allegations would attract national media attention and that both potential

grand jurors and petite jurors would be exposed to what we contend is the false and

distorted information contained in the Complaint. Moreover, defendant argues that

the government's conduct warrants outright dismissal because it was deliberate and

intended to secure a tactical advantage at the expense of defendant's right to a fair

trial before an unbiased jury. Especially considering that the government failed to

preserve the entirety of Jordan's statement to Agent Smiedala.

(D)     *The Government Should Have To Prove A Nonvindictive Motive for Charging
        Defendant With First Degree Murder And Absent Such A Showing That
        Charge Should Be Dismissed.*

Under the Ninth Circuit's decisions in *United States v. Ruesga-Martinez*, 534

F.2d 1367 (1976) and *United States v. Jenkins*, 504 F.3d 694 (2007) defendant argues

that where she was originally charged by Complaint with only second degree murder

an appearance of prosecutorial vindictiveness has arisen because she now stands

charged with the greater crime of first degree murder after successfully claiming her

constitutional right to bail, over the government's objection. Under *Ruesga-Martinez*,

*supra*, where a defendant exercises a procedural right (constitutional, common law

or statutory) the government bears a heavy burden of proving that any increase in the

severity of charges was not motivated by vindictiveness. After she successfully

argued for release on bail both before this Court and before Judge Lynch the government increased her charges before the grand jury to first degree murder. Thus on the basis of the decisional law set forth above the government should have to prove a non-vindictive reason for indicting defendant for first degree murder.

(E)     *The Court Should Inquire Whether This Case Has Been Overcharged And If So Fashion A Remedy*.

Considering all of the arguments raised so far one final subject warrants discussion. Whether the first degree murder charge was brought because there is evidence to support it or because it will serve as useful leverage in plea bargaining. Given that defendant now faces a mandatory life sentence this question should be addressed, if for no other reason, because the government should not be authorized to file charges, just because it can, in order to acquire an advantage in inducing a plea from the defendant. Where, as here, the government has yet to disclose any evidence supporting the element of premeditation, inquiry should be made pre-trial into the merits of the first degree murder accusation. Granted, the government has conveyed to the defense orally that its new theory for guilt centers on Jordan putting a blindfold on Cody and pushing him off the ledge. However, to date no hard evidence supporting that theory has been produced and furthermore given the recency of this theory there is even a doubt whether this claim was put to the grand jury in the first

instance. On the other hand the mere filing of a first degree murder charge produces immediate consequences for the defendant. To risk trial on such a charge is to risk a mandatory life sentence, a sentence not subject to the Court's sentencing discretion. This introduces into the proceeding a degree of uncertainty for the defendant that has no effect on the prosecution at all. In such situations the defendant's focus understandably turns to ways to avoid trial, which correspondingly increases the opportunity for the government to resolve the case by plea bargain.

Plea bargaining, which is so central to the resolution of cases throughout the country, often encourages the filing of marginal more serious charges just to induce the plea. The practice is common and recognized in the cases and there ought to be a judicial remedy to recognize and correct it when it occurs. *See e.g. United States v. Robertson*, 15 F.3d 862 (9th Cir. 1994), *overruled on other grounds*, 514 U.S. 669 (1995), Reinhardt, J. *concurring specially* at 875-877, *and cases cited there* (overcharging common). This follows because as a matter of due process the defendant should not have to relinquish her right to trial for fear of conviction on a charge not brought in good faith just to induce a plea.

Although the Supreme Court has in general terms sanctioned the practice of using higher grade charges as a bargaining chip to induce a plea; there is nevertheless a minimum requirement of probable cause to believe defendant committed the higher

grade offense as well as "constitutional limits upon [the] exercise" of such charging power. *Bordenkircher v. Hayes*, 434 U.S. 357, 365 (1978). *Also see, United States v. Andrews*, 612 F.2d 235 (6th Cir. 1979), Keith Circuit Judge, *dissenting*, at 247-257, *especially Ninth Circuit decisions cited at page 250.*

## IV. **FINAL ARGUMENT**

Whether the Court considers the errors here alone or in combination there is grave cause for concern regarding how this prosecution was instituted.[7] Jordan's July 16th interrogation went largely unrecorded and the parts that were recorded were distorted. Next the government chose to publically proclaim defendant's guilt in an unsealed pleading, based for the most part on those distorted statements. Further at her initial appearance the government told Judge Lynch defendant was a sociopath and undeserving of bail, based on the observations of the investigating government agents. And when defendant successfully argued for her release the government went to grand jury and charged her with the greater crime of first degree murder.

Yet probably most troubling is the fact that the government was working on the case at least two months before filing the public complaint, which we contend poisoned both the grand and petite jury pools. Furthermore it is hard to understand

_____

[7]*See United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996) (recognizing importance of due process cumulative error doctrine).

how the government represented to the Court that it could be ready for trial on December 9th, because it had its case in order, only to reverse itself on that point by telling the defense on October 25th that it is awaiting results of a DNA test on a piece of cloth that the government now apparently contends shows that Jordan blindfolded Cody and pushed him off the cliff; a theory for guilt that the defense is totally unprepared to try under the Court's current schedule.

## V. <u>CONCLUSION</u>

WHEREFORE, the Court should hold a hearing on any or all of the issues in defendant's motion (Doc. #59) and grant appropriate relief including but not limited to dismissal of charges, suppression of evidence and/or denying the government the right to put its new blindfold theory before the jury at the trial scheduled for December 9th.

RESPECTFULLY SUBMITTED November 8, 2013.

   /s/ Michael Donahoe    
MICHAEL DONAHOE
Senior Litigator
Counsel for Defendant

# VI.  CERTIFICATE OF COMPLIANCE

I hereby certify that this Brief is in compliance with Local Rule 7.1(d)(2)(as amended).  The brief's line spacing is double spaced, and is proportionately spaced, with a 14 point font size.  The brief contains 10,233 words (excluding tables and certificates) which does exceed the 6,500 word limit provided by the rule.  A Motion for Leave to File Opening Brief Exceeding Word Limit Set Forth in Local Rule 47.2(a) has been filed.

DATED November 8, 2013.


By:  /s/ Michael Donahoe
        Michael Donahoe
        Federal Defenders of Montana
        Counsel for Defendant

# VII. CERTIFICATE OF SERVICE
## L.R. 5.2(b)

I hereby certify that on November 8, 2013, a copy of the foregoing document

was served on the following persons by the following means:

___1___        CM-ECF

_____        Hand Delivery

___2___        Mail

1.      CLERK, UNITED STATES DISTRICT COURT

1, 2.   Kris McLean
       Assistant United States Attorney
       P.O. Box 8329
       Missoula, MT 59802
           Counsel for the United States of America

1, 2.   Xeno Baucus
       Assistant U.S. Attorney
       901 Front Street, Suite 1100
       Helena, MT 59626-1100
           Counsel for the United States of America

                    /s/ Michael Donahoe
                    FEDERAL DEFENDERS OF MONTANA