**ZENO B. BAUCUS**
**KRIS A. MCLEAN**
**Assistant U.S. Attorneys**
**U.S. Attorney's Office**
**901 Front Street, Suite 1100**
**Helena, MT 59626**
**Phone: (406) 457-5120**
**FAX: (406) 457-5130**
**Email: zeno.baucus@usdoj.gov**
**        kris.mclean@usdoj.gov**

**ATTORNEYS FOR PLAINTIFF**
**UNITED STATES OF AMERICA**

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MONTANA

## MISSOULA DIVISION

| UNITED STATES OF AMERICA, | CR 13-37-M-DWM |
|---|---|
| Plaintiff, | |
| vs. | **UNITED STATES** |
| | **RESPONSE TO** |
| | **DEFENDANT'S MOTION TO** |
| JORDAN LINN GRAHAM, | **DISMISS AND** |
| | **ALTERNATIVE MOTION TO** |
| Defendant. | **STRIKE COUNT I** |

On July 7, 2013, the Defendant pushed Cody Johnson in his back

with two hands off of a cliff to his death. She then engaged in a nine-day campaign to lie to friends, family and law enforcement concerning her involvement while Mr. Johnson lay dead. She now petitions this Court to dismiss the Indictment, or in the alternative, strike Count I because, she contends, law enforcement has been untruthful. The gall of her position would be preposterous if not for the serious nature of the crime that she committed.

The Defendant appears to contend that she is entitled to dismissal of all or part of the Indictment, "or some other appropriate relief," on a number of dubious grounds. Doc. No. 59 at 5.[1] As the Defendant acknowledges, however, "[a]n Indictment returned by a legally constituted and unbiased Grand Jury, like an Information drawn by the prosecutor, if valid on its face, is enough to call for trial of the charge on the merits." *Id*. at 2 (quoting *Costello v. United States*, 350 U.S. 359, 409 (1956). Indeed, a court does "not dismiss an indictment valid on its face absent a showing that the government flagrantly manipulated, overreached or deceived the jury…'[n]or does incomplete evidence before

---

1 Indeed, in addition to the captioned titled of her motion to dismiss the Indictment or, in the alternative, dismiss Count I, the Defendant also appears to allude to a number of other possible remedies. *See e.g.*, Doc. No. 59 at 5.

the grand jury detract from the resulting indictment.'" *United States v. Hickey*, 367 F.3d 888, 894 (9th Cir. 2004) (quoting *United States v. DeLuca*, 692 F.2d 1277, 1280 (9th Cir. 1982). When a defendant alleges prosecutorial misconduct, as this Defendant does, she must show conduct that "substantially influenced the grand jury's decision to indict, or…[that] there is a grave doubt that the decision to indict was free from the substantial influence of such violations." *Bank of Nova Scotia v. United States*, 487 U.S. 250, 256 (1988). Importantly, however, "mere unsubstantiated, speculative assertions of improprieties in the proceedings do not supply the particularized need required to outweigh the policy of grand jury secrecy." *United States v. Ferrebouef*, 632 F.2d 832, 835 (9th Cir. 1980). The Defendant attempts to meet this heavy burden by selectively citing to the recording of her July 16, 2013, interview by law enforcement and attaching a declaration that inserts new, unsubstantial facts into that interview. She has not come close to meeting her burden and her motion should be denied in its entirety.

## A. The Defendant Tells Law Enforcement that She Pushed Mr. Johnson Off a Cliff and Lied About It for Several Days

The crux of Defendant's motion appears to revolve around her July 16, 2013, interview by law enforcement. Prior to that interview, the Defendant had, by her own admission, lied to law enforcement for a week. Doc. No. 59-1 at 89.[2] This included false statements she gave to the Kalispell Police on July 9, and 10, 2013. On July 16, 2013, she was "ask[ed]" to return to the Kalispell Police Department to provide another statement. Decl. of Jordan Graham, Doc. No. 56 at 2. After beginning to regurgitate the same, or a variation of previous, explanations she had given regarding Mr. Johnson's disappearance, she ultimately informed law enforcement that she had been with Mr. Johnson in Glacier National Park on July 7, 2013 and pushed him in the back to his death.

### 1. Defendant's July 16, 2013, Interview was Voluntary

There is no question that Defendant's July 16, 2013, interview was voluntary. To prove his statements were involuntary, the Defendant is required to show that, in the totality of the circumstances, law

---

2 The United States cites to the transcript of the Defendant's July 16, 2013, interview that she submitted to the Court on November 8, 2013. It reserves the right to challenge the accuracy of that transcript.

enforcement obtained the evidence by overbearing her will. *Haynes v. Washington*, 373 U.S. 503, 513-14(1963). The Ninth Circuit has articulated a three-factor voluntariness test that considers: (1) the declarant's state of mind, *see United States v. Turner*, 926 F.2d 883, 888 (9th Cir. 1991) ("A defendant's mental state alone does not make a statement involuntary"; rather, "[c]oercive conduct by police must have caused [the suspect] to make the statements."); (2) the physical environment in which the statement was given; and (3) the manner in which the declarant is questioned, including "tone of voice used" by officers and "promises or representations made by the questioner." *Pollard v. Galaza*, 290 F.3d 1030, 1034 (9th. Cir. 2002) (citing *Henry v. Kernan*, 197 F.3d 1021, 1027 n.3 (9th Cir. 1999); *see also United States v. Gamez*, 301 F.3d1138, 1144 (9th Cir. 2002) (applying voluntariness inquiry under 18 U.S.C. § 3501). Further, the "circumstances surrounding the taking of a confession can be highly relevant to two separate inquires, one legal and one factual." *Crane v. Kentucky*, 476 U.S. 683 (1986). In her pre-trial motion the Defendant appears to attack the legal voluntariness of her July 16, 2013, interview. She has not come close to satisfying this burden. The question of her interview's

factual voluntariness goes to the weight of her statements, not its admissibility, and is left to the domain of the jury. *Id*. at 689.

Here, the Defendant voluntarily drove to the Kalispell Police Station to be interviewed. The interview was conducted by Special Agent (SA) Stacey Smiedala of the FBI, a polygraph examiner with twenty-two years in law enforcement. A detective from the Kalispell Police Department was also in attendance for portions of the interview. Upon arrival, the Defendant was told she was going to have the option of taking a polygraph administered by SA Smiedala. Indeed, the Defendant's own declaration supports this. Doc. No. 56 at 2. The detective introduced SA Smiedala to the Defendant and then left the interview room. The Defendant was provided a FD-395, Advice of Rights" form. Doc. No. 59-1 at 111. The Defendant was then shown a FD-328, "Consent to Interview with Polygraph" form. *Id*. The Defendant was read aloud both forms. *Id*. The Defendant then read aloud the waiver section of both forms, stated she understood them, and then signed them. *Id*. The purpose for this is to allow for the proper administration of a polygraph, which generally calls for a sterile environment that could impact the performance of the polygraph

apparatus.  Thus, any unnecessary light, sounds, or movements are completely discouraged during the execution of a polygraph examination.  No one is allowed in the room during a polygraph process except the examinee and examiner.

Following the detective's departure from the room, SA Smiedala then engaged in a detailed colloquy with the Defendant about how the polygraph examination would be conducted.  This discussion, which lasted between thirty and forty-five minutes, included such topics as how the polygraph instrumentation worked, an explanation of the types of question the agent would ask during the interview, the polygraph format, and a determination by the examiner to determine if the Defendant is fit to participate in the interview and/or polygraph examination.  The biographical questions included, but were not limited to, her date of birth, employment status, criminal history, health and medications, and if she had enough sleep the previous evening.[3]  At that point, the Defendant was asked if she still wanted to proceed with the interview and polygraph examination and she answered in the

_____

3 It is important to emphasize that during the course of this interview, including through the preliminary interview of the Defendant that she was free to leave at any time.  This was made clear to her during the interview and she does not dispute it for purposes of her motion.

affirmative.

Before the components were attached to the Defendant, the Defendant was again asked her understanding concerning Mr. Johnson's disappearance, at which point she regurgitated one of her previous stories about how Mr. Johnson had left with friends the evening of July 7, 2013. Again, the Defendant does not dispute this. SA Smiedala then informed the Defendant the he knew she was in Glacier National Park ("GNP") with Mr. Johnson the evening of July 7, 2013. At that point the Defendant cried and admitted she was with Mr. Johnson in GNP. SA Smiedala then showed the Defendant a picture of her and Mr. Johnson at 9:17 pm on July 17, 2013. The Defendant continued to cry and admitted she pushed him in the back with two hands to his death. The Defendant engaged in an unrecorded session with SA Smiedala during which she explained how she was with Mr. Johnson on the cliff in GNP, that she was very angry, and that she could have walked away before pushing him in the back. Following this statement, SA Smiedala asked the detective to return to the room during which a summary recording of the Defendant's statements was made. At no point did the

Defendant participated in a polygraph examination.[4]   At the conclusion of the interview, when asked if she gave a "voluntary statement," the Defendant answered "yes."   Doc. No. 59-1 at 104.

Now, almost four months after the conclusion of that interview the Defendant attempts to muddy the record by raising, for the first time, allegations concerning the manner in which that interview was conducted and the wording of some of her statements.   This convenient attempt to recreate the record, in the form of a sworn declaration, from a Defendant who has already admitted lying to law enforcement on multiple occasions should be afforded little, if any weight.   SA Smiedala did not, as the Defendant's now contends, "never" take his hand off the Defendant's knee during the interview.   SA Smiedala did tap the knee of the Defendant on at least two occasions in an attempt to be sympathetic and concerned for the Defendant's well-being.   Nor did the agent re-position himself once the detective left the room.   The Defendant and SA Smiedala sat in the same place and on the same side of the table during the entire interview.   To publicly lodge these false

---

4  Because the Defendant was never connected to the polygraph machine, she was administrated what is generally called a "no opinion" test.

allegations now, four months after the interview was conducted, is a remarkable exercise in self-survival.[5]

The Defendant also attempts to attack her interview based on the fact that it was not recorded in its entirety. Indeed, the Defendant charges law enforcement with "selectively preserv[ing] evidence by recording only portions of defendant's interrogation it felt would benefit its case." Doc. No. 59 at 5. Contending that, pursuant to *California v. Trombetta*, 467 U.S. 479, 485 (1984), law enforcement did not preserve her unrecorded statements, the Defendant completely misses the mark. First, there is no support for the allegation that any evidence was not preserved; the Defendant has the write-up of her interview, which includes the unrecorded portions, and will have the ability to cross-examine SA Smiedala at trial as to her statements. Also, the Defendant's argument suffers from an additional defect. The Defendant cites to *no* legal requirement that the Defendant's July 16,

---

5 Should the Court elect to consider the declaration of the Defendant as grounds for it ruling, the United States respectfully submits that it be permitted to cross-examine the Defendant at a hearing on the motions. Just as the Defendant will be afforded the opportunity to cross-examine SA Smiedala about her July 16, 2013, interview, so too should the United States be permitted to question the Defendant on these new statements.

2013, interview be fully recorded.[6]   None.   Indeed, the United States is

not aware of any such requirement.   While Defendant's counsel is free to

inquire during trial as to the methods under which the Defendant's July

16, 2013, interview were conducted and why it was not recorded in its

entirety, that is an issue as to the credibility of her statement, not one of

admission.   The Defendant's attempt to attack a law enforcement tactic,

without any applicable legal authority, in support of her motion to

dismiss does not pass muster.

### 2.   The Defendant's Statements at the July 16, 2013 Interview

The Defendant also charges law enforcement with "unfairly

summarize[ing] her statements thereby rendering them distorted and

false."   Doc. No. 59 at 6.   It is a reckless allegation and conveniently

overlooks a number of statements she did make, as well as the entire

context of the investigation.

During the portion of the interview that was not recorded, which

was conducted by an experienced FBI agent, the Defendant admitted

that she was angry, could have walked away before pushing Mr. Johnson

---

6 Without any, the Defendant cites to a Montana state statute that is not applicable
to an interview conducted by a Federal agent and in connection with an action that
was filed in United States District Court.

to his death, she pushed him in the back with two hands, and she had

never felt so angry in her life.    Indeed, the audio summary recording of

the Defendant's interview confirms these statements as well:

| Question | Defendant's Statement |
|---|---|
| [When asked] "if you could generally tell me what happened" | The Defendant described how "I was kinda getting, some built up anger, not very happy that he was talking at me like I was a child..."[7] |
| "Okay, so he would've fallen face first down the hill?" | "Yes"[8] |
| "...did you push with one hand or two hands?" | "No I took two and I just pushed, like get him off me, like pushed, it was, it was two hands."[9] |
| "Okay, so you pull him off, at that point, couldn't you just walked away from him?" | "Yes. Looking back, I mean, like, I guess I could have"[10] |
| "Okay, it's all hindsight now, but why did you continue to turn around and then push him off?" | "Mainly it's because emotions were running so high, I was frustrated, I was angry, I was, I was, every emotion I could ever think of, all at once and I had never felt like that |

---

7    Doc. No. 59-1 at 79.    Notably and contrary to the Defendant's motion, it is the
Defendant – rather the agent - that first raises the term "angry" in the context of
describing what she was feeling that evening.    The Defendant's self-serving
declaration should be afforded little weight in this regard.

8  *Id.* at 84

9  *Id.* at 85.

10  *Id.* at 102

before, I've never like experienced
that, such high emotions."[11]

These are not "distorted and false" statements from the Defendant
but rather her own words as to what happened on the cliff in GNP on
July 7, 2013.   Moreover, during the unrecorded portion of her interview,
the Defendant did not make any statements concerning an accident,
self-defense, or a lack of premeditation.   The fact she later attempted to
exculpate herself with self-serving statements does not render those
statements true.[12]   It was only when the recorder was turned on that
the Defendant injected these theories into the narrative.   The
Defendant now attempts to challenge her unrecorded statements with an
after-the-fact declaration.   Just as the Defendant changed her story
once the recorder was turned on, now she tries to do so yet again through
a sworn declaration four months later.   This is insufficient for purposes
of moving to dismiss the Indictment and, if anything, speaks to the
credibility of her statements rather than the sufficiency of the
Indictment.

11  *Id.*
12  It is for this reason that Defendant's new argument that the "spontaneity" of her
statement "has been permanently lost" makes little sense.   Doc. No. 58-1 at 26.
Again, the Defendant is free to cross-examine the FBI agent at trial as to the
Defendant's statements and their "spontaneous" nature.

## B. The Defendant is Arrested for Second Degree Murder and Making False Statements

Following Defendant's July 16, 2013, interview law enforcement continued their investigation. This included interviewing dozens of witnesses, applying for multiple search warrants and reviewing voluminous amounts of data. On September 9, 2013, the Defendant was arrested in connection with the murder of Cody Johnson. She was charged with Second Degree Murder and Making False Statements.

### 1. *The Affidavit Supporting Defendant's Arrest*

Supporting the complaint was an affidavit that was submitted for the purpose of establishing probable cause to effectuate the arrest. The affidavit included six paragraphs detailing factual allegations against the Defendant that there was probable cause to arrest her. Only one of those paragraphs related to her July 16, 2013, interview. Indeed, by its very terms, the affidavit was submitted "for the limited purpose of establishing probable cause," and thus, did "not include[] each and every known fact in [the] investigation." Doc. No. 59-1 at 106. Nor is there a duty to present any exculpatory information in the context of a criminal arrest complaint, a proposition the Defendant does not dispute.

The Motion contends that the affidavit submitted to Magistrate Judge Lynch was somehow misleading.   First, as the Motion fails to acknowledge, the Defendant was arrested on Second Degree Murder charges, a crime that does not require premeditation as an element of the offense and thus any inclusions as to premeditation is irrelevant.   More to the Motion's argument, however, is the position that the affidavit was somehow "false" because it "distorted" the Defendant's statement as to being able to walk away or, alternatively, walking away before pushing Mr. Johnson to his death.

The Motion does not account for the fact that the evidence pertaining to the Defendant's statements does indicate that the Defendant had told him she could have walked away.   Nor does the Motion account for any physical re-creation that the Defendant employed in the context of the interview with the agent.   Nor does the Motion account for the evidence of the unrecorded portions of the interview. Instead, the Motion grapples on to one self-serving statement by the Defendant that, in relation to the elements of Second Degree Murder, is of little significance.   Not only is law enforcement permitted to disbelieve such a statement from a defendant, as was the case here, but

15

its relevance for purposes of the arrest is questionable. Whether an individual did or did not walk away before killing someone, especially in the larger context of a murder investigation, would appear to have little bearing on satisfying probable cause that an individual kill "did knowingly and unlawfully kill Cody L. Johnson, with malice aforethought, a violation of Title 18 USC § 1111." Doc. No. 59-1 at 106.

2. *The Publicity Surrounding the Affidavit*

Citing three cases from the 1960s that are not on point, the Defendant alleges that the United States must "explain why it charged the case by unsealed complaint" and that this somehow has caused deprived the Defendant of the opportunity for a fair trial. Doc. No. 58-1 at 41. First, the Defendant cites to no federal or local rule providing that the complaint in the instant action should have been lodged under seal. *See e.g.,* CR 49.1 (listing the types of material in which a motion for leave to file under seal is not required and failing to mention pre-trial publicity). Indeed, courts have generally been strong protectors of the public's right of access to judicial proceedings. *See United States v. Knott,* 2005 WL 1400288, *1-2 (9th Cir. 2005); *United States v. The Business of the Custer Battlefield Museum and Store Located at*

*Interstate 90, Exit* 514, *South of Billings, Montana,* 658 F.3d 1188, 1192 (9th Cir. 2011).

Interestingly, the Defendant fails to mention that *she* has been the party that has injected the lion's share of facts concerning the investigation into the public domain.   Facts that arguably further decrease her standing in the court of public opinion.   These include, but are not limited to, the "blindfold" evidence that Defendant seems to focus on in the instant Motion, as discussed below.   Moreover, and as the Defendant is well aware, the United States has attempted, if anything, to mitigate the disclosure of facts that further implicate the Defendant. First, the "unsealed" affidavit that is at the heart of the argument did *not* contain a number of inculpatory facts that, according to the Defendant, would have further hampered her right to a fair trial.[13]   Also, the Defendant conveniently omits that the United States has requested that certain documents filed with the Court remain under seal because of their sensitive contents.   *See e.g.,* October 25, 2013, Motion of the United States to Place Search Warrant Materials Under Seal.   Put

---

13  This is an additional reason why, despite Defendant's arguments as to her July 16, 2013, interview, there was more than sufficient evidence to arrest her on September 9, 2013.

simply, the Defendant does not have a legal ground to stand on in support of this argument.

## C.   The Defendant is Indicted for First Degree Murder

The Defendant's remaining arguments concern the Indictment that was returned by a Montana Grand Jury charging her with, among other counts, First Degree Murder.   Specifically, the Defendant appears to allege that the government (i) engaged in a vindictive prosecution in response to Judge Lynch detention ruling and (ii) whether this case has been "over-charged."   Doc. No. 58-1 at 42-3.

### 1.   *The United States Has Not Engaged in Vindictive Prosecution*

The Supreme Court has held that "[a] prosecutor violates due process when he seeks additional charges solely to punish a defendant for exercising a constitutional or statutory right." *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978).   Indeed, the high Court later elaborated on its hesitation in entertaining prosecutorial vindictiveness claims that allegedly occur in a pre-trial setting:

> "[T]he prosecutor's assessment of the proper extent of prosecution may not have crystallized," meaning that a decision to add or increase charges as the scope of the case became more clear should not

excite suspicion; and (2) that it is "unrealistic to assume that a prosecutor's probable response" to "routine [ ]" pretrial motions—including "motions to suppress"—would be punitive, given that defendants are "expected to invoke procedural rights that inevitably impose some 'burden' on the prosecutor."

*United States v. Goodwin*, 457 U.S. 368, 381 (1982); *see also United States v. Roller*, 2001 WL 2443689, *3 (N.D.Cal. June 15, 2011) ("Vindictiveness claims are, however, evaluated differently when the additional charges are added during pretrial proceedings...) (quoting *United States v. Gamez-Ordaeo*, 235 F.3d 453, 462 (9th Cir. 2000)).

Here, Defendant appears to argue that because Judge Lynch granted her pre-trial release, the United States elected to charge her with First Degree Murder. It is an absurd proposition and ignores the facts of this case.[14] Leading up to, during, and after the Defendant's arrest, law enforcement continued to collect and analyze evidence in connection with its investigation. As the Defendant acknowledges in her pre-trial motions regarding discovery, the amount of material in

---

14 The Defendant all but implies that following Judge Lynch's decision on pre-trial detainment, the United States went back to its office, did not review any evidence for 3 weeks and then simply decided to turn around and present a charge of First Degree Murder to the Grand Jury because the Defendant was not detained. It is a baseless allegation.

connection with this case has been "extensive."  *See* Defendant's Motion to Compel Government to Identify All Evidence Its Intends to Use, Doc. No. 64 at 4.   It was not until the presentment of this case to the Grand Jury in early October, 2013, did the United States feel it had a sufficient appreciation for all the evidence against the Defendant.   Based on that, it submitted a charge of First Degree to the Grand Jury and received a true bill.[15]  Indeed, the very fact that the United States arrested the Defendant on Second Degree Murder Charges and later submitted an Indictment to the Grand Jury that included First Degree supports the argument that it evaluated additional evidence during that period.

The Defendant primary relies on *United States v. Ruesga-Martinez*, 534 F.2d 1367 (9th Cir. 1976) for her position, a case that pre-dates much of the authority above.   Nonetheless, in *Ruesga*, a defendant who had been initially charged with a misdemeanor, "refused to waive his right to be tried by a district judge and any right that he might had to jury trial,"

---

15  Nor can the Defendant have it both ways. It charges the United States with poisoning the jury pool by arresting the Defendant on an unsealed complaint and, at the same time, contending that the United States later submitted an Indictment with First Degree Murder to the Grand Jury simply because she was granted pre-trial release.   Presumably, if the United States wanted to "secure a tactical advantage" through an unsealed complaint it would have charged her with First Degree Murder, a much more explosive charge.

was then arraigned on a two-count felony indictment. *Id*. at 1368. Here, in complete contrast, the Defendant was initially arraigned on felony murder and subsequently indicted on an additional felony murder. Indeed, it is why a "prosecutor who adds extra charges after the exercise of a procedural right is arguably acting less vindictively that a prosecutor who substitutes a more severe charge for a less server one." *United States v. Andrews*, 633 F.2d 449, 454 (6th Cir. 1980).

2. *The Defendant was Not "Over-Charged"*

Finally, the Defendant contends that she was "over-charged" for pushing Mr. Johnson off a cliff to his death. Doc. No. 58-1 at 43. She basis this argument on, what appears, to be "all the arguments raised so far" and because the United States, from her perspective, "has yet to disclose any evidence supporting the element of premeditation." *Id*. She asks this Court, without any legal support, to inquire into the "merits of the first degree murder accusation." *Id*. Like her previous arguments, this one has no merit and should be dismissed.

Interestingly, the Defendant acknowledges the sanctioned practice of filing "more serious charges just to induce a plea" but that is not what occurred here. Doc. No. 58-1 at 44. In the instant case, the United

States presented evidence to a grand jury for indictment of, among other charges, First Degree Murder. The Grand Jury voted to indict. Unsatisfied with this result, the Defendant challenges the sufficiency of the evidence presented to the Grand Jury. However, "[i]t has been repeatedly stated and well established that an indictment cannot be attached on the ground that evidence before the grand jury was incompetent or inadequate." *Reyes v. United States*, 417 F.2d 916, 919 (9th Cir. 1969); *United States v. Velasquez-Lopez*, 2010 WL 1996605, *1 (D.Airz. May 19, 2010) ("[C]hallenging the sufficiency of the evidence on which an indictment is based does not constitute 'a matter that occurred before the grand jury' that shows that a 'ground may exist to dismiss the indictment.'") (quoting Fed. R. Crim. P. 6(e)(3)(E)(ii)). Nor may a district court dismiss an otherwise valid indictment on the ground that the Government failed to disclose to the Grand Jury substantial exculpatory evidence. *United States v. Williams*, 504 U.S. 36, 112 (1992). The reasoning behind this is evident, because to hold otherwise would "saddle the grand jury with min-trials and preliminary showings would assuredly impede its investigation and frustrate the public's interest." *United States v. Calandra*, 414 U.S. 350 (1974) (quoting

*United States v. Dionisio*, 410 U.S. 1, 17 (1973)).

But that is exactly what the Defendant attempts to do here. The Defendant appears to contend that it is confused as to the Government's theory of the case. The "theory" of the case is contained in the Indictment and discovery that has been produced to the Defendant. It is a discovery that contains voluminous instances of circumstantial evidence of the Defendant's guilt. It is not incumbent on the United States to walk the Defendant through its case before the commencement of trial and hand-pick for the benefit of the Defendant what evidence it will relay on trial.[16] Indeed, the Defendant cites *no* legal justification for this position.

Undaunted, the Defendant next attempts to sidestep its lack of legal support by citing to a "new theory" of guilt involving a "blindfold." Doc. No. 58-1 at 43. No such theory has been articulated to the Defendant and any representations to the contrary are misleading at best.[17] More important, the United States is confident that evidence that

---

16 *See* contemporaneously filed Response of the United States to Defendant's Motion to Identify All Evidence it Intends to Introduce at Trial.
17 The Defendant continuously cites to an October 25, 2013, "conference call" during which the United States, according to the Defendant, informed the Defendant of "its new theory of guilt" involving a "blindfold." Doc. No. 58-1 at 43. A piece of evidence

would support a conviction of the Defendant for the murder of Cody Johnson in the First Degree has been produced to the Defendant. That question, contrary to the Defendant's unsupported legal arguments, is ultimately left for a jury to decide. *United States v. Filbin*, 2000 WL 1770608, *1 (9th Cir. Nov. 30, 2000).

Based on the foregoing reasons, the United States respectfully submits that Defendant's Motion to Dismiss be denied.

DATED this 14th day of November, 2013.

MICHAEL W. COTTER
United States Attorney


*/s/ Zeno B. Baucus*
Assistant U.S. Attorney
Attorney for United States

---

was collected at the scene and its recovery and processing has been produced to the Defendant in the normal course of discovery before the discovery deadline. On October 25, 2013, the United States informed counsel for the Defendant that the evidence, which could have been a "blindfold," but only the Defendant knows for sure, was being tested for DNA and may not receive the results until after the discovery deadline. Counsel for the Defendant acknowledged this and the "conference call" concluded. There was no discussion of premeditation during that discussion and Defendant's invocation of it now is informative.

**CERTIFICATE OF COMPLIANCE**

Pursuant to D. Mont. LR 7.1(d)(2) and CR 12.1(e), the attached

Response to Defendant's Motion to Dismiss and Alternative Motion to

Strike Count I is proportionately spaced, has a typeface of 14 points or

more, and the body contains 4,219 words.

/s/ *Zeno B. Baucus*
Assistant U.S. Attorney
Attorney for United States