IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JORDAN LINN GRAHAM,<br><br>Defendant. | CR 13–37–M–DWM<br><br><br><br>ORDER |

On May 29, 2026, Defendant Jordan Linn Graham filed a motion under 18 U.S.C. § 3582(c)(1)(A) to reduce her 365-month federal murder sentence, (Doc. 291; *see* Doc. 224 (Judg.)). Graham's projected release date is November 10, 2039. *See* Inmate Locator, http://www.bop.gov/inmateloc (accessed Aug. 13, 2026). The government opposes, (Doc. 295), and has submitted six victim impact statements in opposition, (*see* Doc. 300-1 (sealed)). Because Graham fails to show that she is eligible for a reduction under 18 U.S.C. § 3582(c)(1)(A)(i) and a reduction is not warranted under 18 U.S.C. § 3553(a), her motion is denied.

## BACKGROUND

### I. Underlying Conduct and Investigation

In October 2011, Graham met and began dating Cody Johnson. (PSR ¶ 9.) They got engaged in December 2012 and were married on June 29, 2013. (*Id.*) In

the days immediately following the wedding, Graham expressed doubt regarding the marriage and informed a friend that she intended to bring it up with Johnson but was afraid to do so. (*Id.* ¶¶ 10–11.) In what was later determined to be subterfuge, Graham told her friend that, on July 7, 2013, she and Johnson got into a fight, he intentionally scratched her with a key, and then left without taking his phone or telling her where he was going. (*Id.* ¶¶ 12–13.) The next day, July 8, Johnson was reported missing and Graham gave inconsistent statements to different people regarding when she had last seen him and where he may have gone. (*Id.* ¶¶ 15–16.) Graham was interviewed by law enforcement on July 9 and maintained that she knew nothing more about Johnson's whereabouts. (*Id.* ¶ 17.)

On July 10, Graham received an email that she shared with law enforcement, stating:

> Hello Jordan, My name is Tony. There is no bother in looking for [Johnson] anymore. He is gone. I saw your post on twitter and thought I would email you. He had come with some buddies and met up with me on Sunday night in Columbia Falls. He was saying he needed to be with buddies for a bit and take them for a joy ride before they had to go. So he said bye to me and took off in a black car for a ride. 3 of the other guys came back saying they had gone for a ride in the woods somewhere and [Johnson] got out of the car and went for a little hike and they are positive he fell and he is dead Jordan. I don't know who the guys were but they took off. So call off the missing persons report. [Johnson] is for sure gone. Tony.

(*Id.* ¶¶ 18–19.) It was later discovered that Graham drafted this email herself. (*Id.* ¶ 18.) Despite this attempt to thwart the investigation, both law enforcement and

Johnson's family and friends continued to look for him, pressing Graham to do so as well. (*Id.* ¶¶ 20–21.) Ultimately, on July 11, Graham and several others went into Glacier National Park and, with Graham leading, "discovered" Johnson's body below a cliff near a hiking trail on part of the Going-to-the-Sun Highway known as "the Loop." (*Id.* ¶ 21.) Graham's attempts at subterfuge continued as in her subsequent statements to law enforcement she maintained the ruse that she was not with Johnson at the time he fell but rather that she had thought to look there because he had previously mentioned a desire to hike on that trail. (*Id.* ¶ 22.) She also provided the following written statement:

> Left Sunday night with buddies to go for a joy ride. Always said he liked to go on/off trails and wanted to make his own off the beaten path. When someone visited, he would want to take them on crazy roads or crazy hikes. Would often try and find trails on his own. Be it in an off road car or on foot. I saw what looked like a black jacket rolled up, some bare skin and darker greenish shorts.

(*Id.* ¶ 23.) Graham also made statements that now that a body had been found there could be a funeral and the cops could stay out of it. (*Id.* ¶ 24.) On July 12, Johnson's body was recovered from the base of a 300-foot cliff in Glacier National Park. (*Id.* ¶ 25.) The cause of death was determined to be blunt force trauma to the head. (*Id.*)

On July 16, Graham was interviewed by FBI Special Agent Stacey Smiedala. (*Id.* ¶ 26.) During that interview, Graham initially denied any involvement in Johnson's death and denied being present in Glacier National Park

on July 7. (*Id.*) After being confronted with photographs of her in a vehicle entering the Park with Johnson and leaving the Park alone that day, Graham admitted that she had lied about the incident and provided multiple false statements to law enforcement. (*Id.*) Graham told Agent Smiedala that she and Johnson argued on July 7, they decided to go for a drive, and when they got to the Loop Trial in Glacier National Park they went for a short hike, continued to argue, and she pushed him after he grabbed her arm. (*Id.* ¶ 27.) Graham denied intending or planning to kill Johnson. (*Id.* ¶ 28.) Despite this confession, Graham subsequently told numerous people that she was not involved in Johnson's death and had even cleared her name by taking several lie detector tests. (*Id.* ¶¶ 33–36.) It was also discovered that in the hour or so after Johnson's death, Graham texted friends about how excited she was to go dancing, (*id.* ¶ 12), and posted on social media about an actress in a movie she was watching, (*id.* ¶ 31).

On September 9, 2013, Graham was charged by criminal complaint with second degree murder. (Doc. 1.) On October 3, 2013, the grand jury returned an indictment charging Graham with first degree murder (Count 1), second degree murder (Count 2), and making false statements to law enforcement (Count 3). (Doc. 28.) There was a significant amount of pretrial motions practice, focused in part on Agent Smiedala's questionable interrogation practices, (*see* Doc. 128), and the government's unsuccessful attempt to pursue a first-degree murder theory that

Graham "blindfolded" Johnson before pushing him off the ledge, (*see* Doc. 98 at 147–59; Doc. 260 at 54–59).

## II. Trial and Plea

A four-day jury trial was held in December 2013. (*See* Docs. 260–64 (transcripts).) The government called 30 witnesses, including 11 law enforcement officers. (*See* Doc. 169.) The defense called 12 witnesses. (*See* Doc. 170.) Graham did not testify. Ultimately, the trial did not result in a verdict as, on the fourth day, Graham pled guilty to second degree murder (Count 2) prior to the jury being instructed on the law. (*See* Doc. 264 at 109–13, 137–38.) In return, the government agreed to dismiss the first-degree murder charge (Count 1) and obstruction charge (Count 3) at sentencing. (*Id.* at 113.) Although there was no written plea agreement, Graham was advised of her rights and the possible penalties, including the possibility that she could receive a life sentence, in a colloquy with the Court. (*Id.* at 115–130.) When Graham voiced uncertainty regarding the consequences of her plea, the Court clarified that she understood that she "might be committing [her]self to a federal prison for the balance of [her] life." (*Id.* at 123.) Graham ultimately admitted that she pushed Johnson off the cliff during an argument, that "[i]t was definitely reckless with extreme disregard" for his life, and that she made no attempt to render aid or seek help. (*Id.* at 133–35.)

## III. Sentencing and Appeal

On March 25, 2024, Graham filed a motion to withdraw her guilty plea on the ground that while she had agreed to plea to second degree murder, the government's sentencing documents indicated that it intended to pursue a premeditation theory, (*see* Docs. 200, 209). (Doc. 217.) That motion was argued at Graham's March 27, 2024 sentencing hearing and ultimately denied on the basis that the parties' divergent sentencing arguments did not qualify as a fair and just reason for Graham to withdraw her plea. (*See* Doc. 241 at 5–22.) Additionally, the Court denied Graham's motion to strike certain sentencing letters, (*see* Doc. 241 at 28 (citing 18 U.S.C. § 3661)), and declined to apply a two-level enhancement for directing her minor brother to lie on her behalf, (*see id.* at 29–36 (discussing USSG §3B1.4)). Of particular relevance here, the Court applied a two-level obstruction enhancement under §3C1.1 and denied a two-level acceptance of responsibility reduction under §3E1.1(a). (*Id.* at 36, 47, 61.) Discussed in further detail below, Graham argued that because her obstructive conduct did not actually hinder the investigation—i.e., it was ineffective—she should not be penalized for that conduct in her Guideline calculation. (*Id.* at 37–42.) The Court concluded, however, that Graham's creation of the false email qualified as obstructive conduct regardless of how ineffectual it was. (*Id.* at 42–43, 47–50.) In regard to acceptance, Graham argued that she took responsibility for the murder in her interview with Agent Smiedala and was forced to proceed to trial to fight the first-

degree murder charge. (*Id.* at 51–54.) The Court disagreed, finding that Graham consistently denied or attempted to diminish her culpability. (*Id.* at 57–61.) Based on those rulings, Graham's total offense level was 40 and, with a criminal history category of I, her advisory Guideline range was 292 to 365 months. (*Id.* at 87–88.) Ultimately, Graham was sentenced to 365 months of incarceration with 5 years of supervision to follow. (Doc. 224.)

Graham timely appealed. (Doc. 273.) In November 2015, the Ninth Circuit affirmed her conviction, concluding that the government did not breach the plea agreement by arguing premeditation at sentencing and this Court did not abuse its discretion in denying her request to withdraw her plea, her motion to dismiss for vindictive prosecution, and her request to inspect the grand jury transcript. (Doc. 275.) The Circuit also affirmed her sentence, concluding that Graham's fraudulent email justified the obstruction enhancement and that the denial of the acceptance of responsibility reduction was reasonable. (*Id.*) Graham has been incarcerated since 2014 and now seeks a sentence reduction through the mechanism of compassionate release.

## ANALYSIS

The First Step Act of 2018 gives district courts wide discretion to reduce an existing term of imprisonment so long as a defendant first seeks relief from the Bureau of Prisons ("BOP") and the reduction: (1) is consistent with the applicable

policy statements of the Sentencing Commission, (2) takes into consideration the sentencing factors of 18 U.S.C. § 3553(a), and (3) is warranted by "extraordinary and compelling reasons." 18 U.S.C. § 3582(c)(1)(A); *United States v. Keller*, 2 F.4th 1278, 1284 (9th Cir. 2021) (per curiam). The Court must also find that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." USSG §1B1.13(a)(2).

Here, Graham argues that because her advisory Guideline range should have been lower, she received a longer, disparate sentence than warranted, giving rise to an extraordinary compelling reason for a sentence reduction. She also argues that circumstances of her incarceration—her age, isolation, and rehabilitation—provide an independent basis. She is incorrect on both fronts. Because she fails to show either an extraordinary and compelling reason for early release or that the § 3553(a) factors support such relief, her motion is denied.

## I. Exhaustion of Administrative Remedies

A defendant may only file a motion for compassionate release with the district court once she has "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A). Here, Graham filed a request for relief with the warden in January 2026, and it does not

appear the warden responded. (Doc. 292-1). Graham has therefore exhausted her administrative remedies as required by statute.

## II. Extraordinary and Compelling Reasons

Before a district court can exercise its discretion to grant a prisoner compassionate release, "a court must first ensure that a movant is part of the 'limited class of prisoners' who are 'eligible' for such a reduction." *Rutherford v. United States*, 608 U.S. ___, 146 S. Ct. 1320, 1333 (2026) (quoting *Dillon v. United States*, 560 U.S. 817, 825 (2010)) (alteration omitted). "This gatekeeping requirement" is "a distinct analytical step that imposes independent and ascertainable limits on access to compassionate release." *Id.* A reduction in sentence is therefore prohibited "unless a court finds that 'extraordinary and compelling' reasons warrant it." *Id.* While the First Step Act does not define "extraordinary and compelling reasons," Congress authorized the United States Sentencing Commission to promulgate policy statements that "describe what should be considered extraordinary and compelling reasons for sentence reduction," 28 U.S.C. § 994(t), and clarified that any grant of compassionate release must be consistent with the Commission's policy statements, 18 U.S.C. § 3582(c)(1)(A). The Commission's discretion is limited, however, to the extent its "policy statements must be 'consistent with' the governing statute." *Rutherford*, 146 S. Ct. at 1334 (quoting 28 U.S.C. § 994(a)). Indeed, "[a] reason is

'extraordinary' and 'compelling' only if it is sufficiently unusual and convincing to 'warrant' compassionate release." *Id.* at 1332 (quoting 18 U.S.C. § 3582(c)(1)(A)(i)). Thus, "[w]hile the terms 'extraordinary' and 'compelling' leave room for judgment, they are not so flexible as to encompass any consideration." *Id.* For example, the Supreme Court recently held that the sentencing disparity created by Congress's nonretroactive changes to 18 U.S.C. § 924(c)'s mandatory penalties does not qualify, *id.* at 1335, nor does a collateral attack on the validity of a prisoner's conviction, *Fernandez v. United States*, 608 U.S. ___, 146 S. Ct. 1292, 1307 (2026). Graham fails to show that she is eligible for early release under § 3582(c)(1)(A).

**A. Unusually Long Sentence**

The Sentencing Commission has determined that extraordinary and compelling reasons exist if the defendant received an "unusually long sentence," i.e.,

> [i]f a defendant received an unusually long sentence and has served at least 10 years of the term of imprisonment, a change in the law (other than an amendment to the Guidelines Manual that has not been made retroactive) may be considered in determining whether the defendant presents an extraordinary and compelling reason, but only where such change would produce a gross disparity between the sentence being served and the sentence likely to be imposed at the time the motion is filed, and after full consideration of the defendant's individualized circumstances.

USSG §1B1.13(b)(6); *but see Rutherford*, 146 S. Ct. at 1335 ("Congress's

nonretroactive change to § 924(c)—considered by itself or in combination with other factors—cannot make a prisoner eligible for compassionate release."). Relying on this provision, Graham argues that she received an "unusually long sentence" because her Guidelines calculation was "too high." (Doc. 292 at 10.) According to Graham, she should have received a three-level downward adjustment to her advisory Guideline calculation pursuant to USSG §3E1.1(a) and (b) and that a "change in the law impacting this analysis is articulated" in a 2025 Southern District of New York decision, *see United States v. Taveridze*, 769 F. Supp. 3d 264 (S.D.N.Y. 2025), which determined that §3E1.1(b) is unconstitutional. Graham's argument is unpersuasive.

As a threshold matter, Graham's post hoc attack on the Guideline calculation underlying her sentence likely falls outside the bounds of § 3582(c)(1)(A). *See Fernandez*, 146 S. Ct. at 1304 (explaining that "Congress's decision to route compassionate release motions through the [BOP] strongly suggests that the extraordinary and compelling reasoning warranting compassionate release must be reasons that the Director [of the BOP] is competent to assess" (cleaned up)). But even if her argument was appropriate in this context, it lacks merit as discussed below.

Section 3E1.1(a) provides that if a "defendant clearly demonstrates acceptance of responsibility for his offense," the district court should "decrease the

offense level by 2 levels." Section 3E1.1(b) further provides that "upon motion of the government stating that the defendant has assisted authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently," the court should "decrease the offense level by 1 additional level." "A court may compel the award of the added point only if the government's refusal was either animated by an unconstitutional motive or arbitrary." *United States v. Yates*, ___ F.4th ___, 2026 WL 2180969, at *8 (9th Cir. July 29, 2026) (internal quotation marks omitted).

At sentencing, Graham was awarded neither the 2-level reduction under §3E1.1(a) nor the additional 1-level reduction under §3E1.1(b). Neither decision has been undermined by the passage of time or a change in law. As to §3E1.1(a), this Court explained at Graham's 2014 sentencing hearing that, while there were some facts the supported a finding that Graham accepted responsibility,

> Ms. Graham lied to law enforcement about her involvement and provided . . . false leads and false information to law enforcement agents, and she made repeated and continued representations to her community of friends and in the community. Even after she had admitted to Agent Smiedala her pushing [Johnson] off, she indicated that she had been cleared and that she passed numerous lie detector tests, and she repeatedly made statements that the case is over. "It's closed. I passed a lie detector three times." And none of the things that she was saying manifested, prior to indictment, any acceptance of responsibility. It was a continued course of lying and prevarication and

> misrepresentation that seems to be an inherent part of her life.
>
> She made statements that what she did, she did only to get law enforcement to leave her alone and not out of any remorse or guilt. And that, I think, is reflected in the presentence report where she indicated, now that the body was found, the detective could get out of her business and the cops could stay out of it.
>
> Whatever was said in the confession to Agent Smiedala I don't think is controlling. The admission actually occurred after she repeated the lie about [Johnson] getting in a car with the three friends from out of state to go for a ride, and it was only after she was confronted with the picture of her driving out of the park or into the park that she broke down and then revealed that she had pushed him off of the cliff.
>
> Her statement for the acceptance of responsibility was filed after the presentence report, and I've read it, and I've read it carefully, and it's difficult to convert that into an acceptance of responsibility in the sense of the guidelines, particularly in light of the obstruction of justice. Her letter, as I read it, and it may be that it's simply my inability to understand the true significance, but I don't see that she is accepting responsibility for her killing another human being. It seems like she's regretful for the inconvenience that's been created but simply hasn't, in my mind, accepted responsibility.
>
> I watched her during the course of the trial and during the course of the plea colloquy, and she showed simply -- and not that showing emotion is a manifestation of the acceptance of responsibility, but having killed another person and then having admitted it in open court, one might -- I would expect there might be a modicum of emotion, which did not exist.
>
> And the enhancement under [§]3C1.1, coupled with the facts of the case, it's my judgment that this is not one of those rare cases, and that ordinarily when there is an obstruction of justice enhancement, the acceptance of responsibility is not granted. And under the facts of this case, I'm convinced that she's not entitled to the acceptance of responsibility for the 2-level reduction.

(Doc. 241 at 59–61.) That decision was affirmed on direct appeal:

> The district court properly denied Graham's request for a two-level downward adjustment for acceptance of responsibility. The court's factual determination as to whether a defendant accepted responsibility "is entitled to great deference on review," U.S.S.G. § 3E1.1 cmt. n.5, and when reviewing under a clear error standard, we may not reverse absent a definite and firm conviction the district court made a mistake, *see United States v. Dann*, 652 F.3d 1160, 1176 (9th Cir. 2011). The district court's factual determinations here were reasonable. Graham lied repeatedly to law enforcement and, even after confessing she pushed Johnson off the ledge, told friends she had been exonerated by multiple polygraph tests.

*United States v. Graham*, 630 F. App'x 712, 715 (9th Cir. 2015). Graham provides no viable challenge to either conclusion under § 3582(c)(1)(A). *See Fernandez*, 146 S. Ct. at 1303 (emphasizing that the "focus" of the compassionate release statute is "on granting mercy rather than righting legal wrongs").

As to §3E1.1(b), Graham argues she should have received the additional point because the government's ability to deprive a defendant of the reduction is unconstitutional and the provision has since been amended "to minimize any deterrent effect on defendants' ability to exercise their constitutional rights" to trial. (Doc. 292 at 13.) That argument is not compelling for two reasons. First, because Graham did not receive the 2-level reduction under §3E1.1(a), she was not eligible for the additional 1-level reduction under §3E1.1(b). *See* USSG §3E1.1(b) (stating that subsection (b) may apply "*[i]f the defendant qualifies* for a decrease under subsection (a) (emphasis added)). Even if she were eligible, a court cannot compel the government to offer the reduction absent a showing of unconstitutional

motive or arbitrariness, a fact the Ninth Circuit recently reaffirmed *after* the Southern District of New York's decision in *Taveridze*. *Yates*, 2026 WL 2180969, at *8.

Second, Graham is indeed correct that the Sentencing Commission amended §3E1.1(b) in 2023 to provide a definition of "preparing for trial" in order "to minimize any deterrent effect on defendants' ability to exercise their constitutional rights." Amend. 820, USSG, app. C, at 233 (2025). But contrary to Graham's characterization, the 2023 amendment was intended to distinguish between actions taken in preparation for trial (where reduction could be withheld) from pretrial or posttrial proceedings (where reduction should not be withheld). *See id.* Per that amendment, "preparing for trial" means "substantive preparations taken to present the government's case against the defendant to a jury . . . at trial." *Id.* It "is ordinarily indicated by actions taken close to trial, such as preparing witnesses for trial, in limine motions, proposed voir dire questions and jury instructions, and witness and exhibit lists." §3E1.1(b). Accordingly, the amendment does not limit the government's ability to withhold the additional point reduction where it actually tries its case. *See Yates*, 2026 WL 2180969, at *7 (upholding government's decision not to file a motion under §3E1.1(b) in a stipulated bench trial because "[t]he government engaged in ordinary pretrial tasks such as participating in conferences and scheduling, meeting with potential witnesses,

filing witness exhibit lists, negotiating and filing joint stipulations, and addressing [legal] disclosures"). That is the case here. The government prepared the case for trial and presented its case before Graham pled.

Because Graham has not shown a change in law that produced a grossly disparate sentence, she has not shown extraordinary and compelling reasons under §1B1.13(b)(6).

**B. Other Reasons**

Graham further argues that she qualifies for relief under §1B.13's "catchall" provision, which provides for such "other circumstances or combination of circumstances" that are independently or cumulatively of a similar gravity to those enumerated in the Guidelines. *See* §1B1.13(b)(5). According to Graham, such circumstances include her young age at the time of her offense, her BOP placement far away from her friends and family, her post-sentencing efforts to rehabilitate, and her expression of genuine remorse. This argument fares no better. As discussed above, the Supreme Court recently clarified that "[a] reason is 'extraordinary' and 'compelling' only if it is sufficiently unusual and convincing to 'warrant' compassionate release." *Rutherford*, 146 S. Ct. at 1332 (quoting 18 U.S.C. § 3582(c)(1)(A)(i)). In this context, "'[e]xtraordinary means 'most unusual,' 'far from common,' and 'having little or no precedent.'" *Fernandez*, 146 S. Ct. at 1302 (quoting Webster's Third Int'l Dict. 807 (1976)). The factors cited

by Graham are far from unusual. And Congress has specifically foreclosed a finding that rehabilitation, by itself, can qualify as extraordinary and compelling. 28 U.S.C. § 994(t).

Based on the foregoing, Graham has failed to show extraordinary and compelling reasons as required by § 3582(c)(1)(A).

## III. Section 3553(a) Factors

Even if Graham had demonstrated an extraordinary and compelling reason to reduce her sentence, such a showing meets only one requirement of § 3582(c)(1)(A). To determine whether relief is appropriate, a court must also consider the federal sentencing objectives set forth in 18 U.S.C. § 3553(a). Pertinent factors include the "nature and circumstances of the offense and the history and characteristics of the defendant," the need for the sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," to deter criminal conduct and protect the public, and to provide effective correctional treatment, including education or vocational training and medical care. *See* 18 U.S.C. § 3553(a)(1), (2). Courts may also consider the advisory Guideline range and the need to "avoid unwarranted sentencing disparities" among similarly situated defendants. *See id.* § 3553(a)(4), (6).

As detailed above, Graham killed her husband of one week and lied about

her involvement in his death until she was charged with murder. Both acts caused immeasurable harm, as reflected in the letters submitted by Johnson's family in opposition to the present motion. (*See* Doc. 300-1.) To be sure, Graham has taken advantage of rehabilitative programming while in custody over the last 13 years and paid a substantial portion of her restitution. And she does not have any other criminal history or pose a general threat to the public. But these facts do not diminish the seriousness of her crime or undermine the justification for the sentence imposed in 2014. The Court is no more convinced of her diminished culpability now than it was then. Simply put, Graham's current sentence remains the sufficient but not greater than necessary sentence in this case.

## CONCLUSION

Accordingly, IT IS ORDERED that Graham's motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A) (Doc. 291) is DENIED.

DATED this 18th day of August, 2026.

11:17 AM

Donald W. Molloy, District Judge
United States District Court